Merrimack
Nos. 2003-669
2003-689

NEW HAMPSHIRE WATER RESOURCES COUNCIL

v.

STEELS POND HYDRO, INC. & a.

Argued: May 12, 2004
Opinion Issued: June 30, 2004

*Peter W. Heed*, attorney general (*Richard W. Head*, assistant attorney general, on the briefs and orally), for the plaintiff.

*Orr & Reno, P.A.*, of Concord (*Howard M. Moffett & a.* on the briefs, and *Mr. Moffett* and *Douglas L. Patch* orally), for the defendants.

DALIANIS, J. In these consolidated cases, the plaintiff, New Hampshire Water Resources Council (WRC), appeals decisions of the Superior Court (*Fitzgerald*, J.) granting summary judgment to the defendants, Steels Pond Hydro, Inc. (Steels Pond) and Pittsfield Hydropower Company, Inc. (Pittsfield Hydro). We affirm in part, reverse in part and remand.

The WRC owns the Steels Pond Dam and the Pittsfield Mill Dam, and leases one to each defendant. The defendants use the dams for hydroelectricity production. The WRC entered into fifty-year lease agreements with Pittsfield Hydro in 1981, and with Steels Pond in 1983. The leases are not identical, but they have similar rent payment structures by which the defendants must pay annually to the WRC a percentage of revenue "received from power sales."

Both defendants sold power to Public Service of New Hampshire (PSNH) pursuant to a rate order approved by the New Hampshire Public Utilities Commission (PUC). In 2002, the defendants signed agreements with PSNH that provided for lump sum payments from PSNH to the defendants in exchange for lower rate orders. The PUC approved the new rate orders.

The WRC contends that the lump sum payments from PSNH to the defendants are monies received from power sales, and, therefore, the

WRC is entitled to a percentage of the payments under the lease agreements. The defendants argue that the payments are consideration for the defendants' lowering the rate orders, and are not revenue received from power sales under the plain meaning of the lease agreements.

The superior court granted the defendants' motions for summary judgment, finding that the "language in the lease is not ambiguous" and the term "power sales" in the lease agreements does not apply to the lump sum payments from PSNH to the defendants. The superior court found that "[t]he plain meaning of the term power sales is the exchange of power for consideration," and "PSNH did not pay [the defendants] for power."

In reviewing the trial court's grant of summary judgment, we consider the affidavits and other evidence, and all inferences properly drawn from them, in the light most favorable to the non-moving party. *Big League Entm't v. Brox Indus.*, 149 N.H. 480, 482 (2003). If our review of that evidence discloses no genuine issue of material fact, and if the moving party is entitled to judgment as a matter of law, we will affirm the grant of summary judgment. *Id.* We review the trial court's application of the law to the facts *de novo. Id.*

We turn to the lease agreements to determine whether the WRC is entitled to a percentage of the lump sum payments. Because a lease is a form of contract, we construe a lease by applying the standard rules of contract interpretation. *Town of Ossipee v. Whittier Lifts Trust*, 149 N.H. 679, 685 (2003). In the absence of ambiguity, the intent of the parties to a lease is to be determined from the plain meaning of the language used. *Echo Consulting Services v. North Conway Bank*, 140 N.H. 566, 569 (1995). The words and phrases used by the parties will be assigned their common meaning, and we will ascertain the intended purpose of the lease based upon the meaning that would be given to it by a reasonable person. *ELCA of N.H., Inc. v. McIntyre*, 129 N.H. 114, 116 (1987). The meaning of a contract is ultimately a matter of law for this court to decide, including the determination of whether a contract term is ambiguous. *Echo Consulting Services*, 140 N.H. at 569.

Paragraph 13(b) of the lease between the WRC and Pittsfield Hydro requires Pittsfield Hydro, as lessee, to pay rent equal to a percentage of "adjusted gross operating revenue received from power sales at the facility, (hereinafter 'AGR')"; the percentage of AGR to be paid to the WRC rises over the fifty-year lease term, capping at "10.0% of AGR for years 16 through 50 inclusive."

Similarly, paragraph 14(b) of the lease between the WRC and Steels Pond sets forth the rent to be paid to the WRC: "Twenty percent (20%) of GR [Gross Revenue] received from power sales at the Facility for years eleven (11) through fifty (50), inclusive." Paragraph 14(a)(i) defines "Gross

Revenue" as "income received by [Steels Pond] from the sale of electrical power produced by the Facility at the Premises." Both leases provide for a graduated rent based on a percentage of "power sales at the facility."

The defendants paid the WRC a percentage of the original PSNH rate orders pursuant to the lease agreements until 2002, when the defendants and PSNH renegotiated for the new, reduced rate orders. There is no provision in the lease agreements for adjustments of rate orders.

The WRC contends that "revenue received from power sales" includes any income received by the defendants that is "tied to the product sold using the State's resources (the dam, impounded water and flowage rights)." The WRC argues that the lump sum payments were tied directly to revenue from power sales because they were conditioned on a total reduction in future payments for power; additionally, the lump sum payments were "calculated to be equal to the difference between what PSNH would have paid [to the defendants] for the power under the existing rate order[s] or power contract[s] and what it anticipates it will not pay for the same amount of replacement power" under the new rate orders or power contracts. Thus, the WRC asserts that the lump sum payments are for "future power production" and, therefore, must be considered when calculating the percentage of "AGR" or "GR" owed by the defendants to the WRC for rent.

In the alternative, the WRC argues that the term "power sales" in the lease agreements is ambiguous because the WRC and the defendants reasonably disagree as to the meaning of the rental language in the lease agreements. *See Woodstock Soapstone Co. v. Carleton*, 133 N.H. 809, 815 (1991). The WRC contends that we should remand to the superior court for a hearing to determine the proper interpretation of the ambiguous lease.

The defendants argue that the superior court properly found that "the plain and unambiguous language of the lease says that rent is calculated using a percentage of the money from power sales," and "the plain meaning of the term power sale is the exchange of power for consideration." The defendants contend that there was no exchange of power; rather, PSNH paid money to the defendants to terminate the rate orders and to reestablish the rates at which they would sell PSNH power in the future. Therefore, the plain meaning of "power sales" does not apply to PSNH's buy down of the rate orders.

We agree with the superior court that the lease agreements are clear and unambiguous. Under their plain terms, the WRC is entitled to a percentage of revenue from the sale of power. The common meaning of "sale" is: "the act of selling: a contract transferring the absolute or general ownership of property from one person or corporate body to another for a price." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2003

(unabridged ed. 2002). Thus, in order for a "power sale" to occur, the defendants must transfer power to another for a price.

We agree with the superior court that under the lease agreements, the defendants are obligated to pay a percentage only of money received for power that is *actually* exchanged for consideration. In this case, the defendants did not actually create or provide any power in exchange for the lump sum payments. This construction of the lease agreements not only is necessitated by the plain meaning of "power sales," but also comports with an interpretation adopted by the majority of courts that have addressed the analogous issue of royalties paid pursuant to leases that include "production" clauses. *See, e.g., Harvey E. Yates Co. v. Powell*, 98 F.3d 1222, 1230 (10th Cir. 1996) (royalties are not owed unless and until actual production of gas or oil; royalties are only due upon physical extraction of the gas or oil from the ground).

The superior court ended its inquiry, however, upon finding that the lease agreements were unambiguous and granted summary judgment for the defendants. While we agree with the superior court's assessment of the language in the lease agreements, we do not agree with its conclusion. The cases that interpret the "production" clauses in oil and gas leases are also instructive in determining whether the lump sum payments in this case are revenue from power sales under the lease agreements. *See id.* at 1230-31; *Shoshone Indian Tribe of the Wind River Reservation, Wyoming v. United States*, 58 Fed. Cl. 77, 87-89 (Fed. Cl. 2003); *Watts v. Atlantic Richfield Co.*, 115 F.3d 785, 792 (10th Cir. 1997); *In re Century Offshore Management Corp.*, 111 F.3d 443, 448-50 (6th Cir. 1997); *Westerman v. Rogers*, 1 P.3d 228, 233 (Colo. Ct. App. 1999).

In *Yates*, the United States Court of Appeals for the Tenth Circuit held that the plain meaning of the term "production" is an actual exchange of gas for consideration; thus, "the duty to pay royalty under a lease which conditions royalty payments on 'production' is not triggered unless and until gas is physically extracted from the leased premises." *Yates*, 98 F.3d. at 1236. The court distinguished between "proceeds attributable solely to take-or-pay deficiencies (*i.e.*, non-production)" and payments "attributable, at least in part, to a price adjustment for the actual production of gas from" the leased lands that would later be acquired by the payors. *Id.* at 1235. The former payments, those for "non-production," are not royalty bearing. However, with regard to payments that are attributable to a reduction in future price there is a duty to pay royalties, but it is "not triggered *until* that future production [actually takes place]." *Id.* at 1236.

As the court explained:

> [I]t would grant a windfall to the lessee if the lessee were permitted to retain the entire lump sum cash "buy down" without *ever* paying a royalty to the state on the buy-down [payment] amount that is used as a partial up-front payment for later gas that is produced and taken at below-contract prices.

*Id.* "If royalties were not ever payable on [a payment] attributable to future price reductions on actual production taken by the . . . purchaser [who made the payment], a lessee would be encouraged to avoid its royalty obligation by accepting large nonrecoupable payments in exchange for reduced prices on future production." *Id.* Thus, the lessee's duty to pay royalties on a payment attributable to future price reductions is triggered when that future production actually takes place. We find this analysis of royalty payments on "production" clauses persuasive and applicable to this case, and we hold that the defendants owe the WRC a percentage of the lump sum payments, to be paid over the term of the lease.

We note that while all parties refer to Steels Pond's renegotiation of the rate order as a "buydown," and Ponds Hydro's as a "buyout," no party argues a distinction between the two lump sum payments; to the contrary, all parties agree that the lump sum payments should be characterized in the same way. Thus, we treat the defendants' circumstances as indistinguishable. The defendants received lump sum payments to renegotiate the rate orders or power contracts with PSNH; thus, PSNH bought-down the existing rate orders, and the defendants immediately implemented a lower future price for power upon receipt of the lump sum payments. The WRC is not entitled to a percentage of that lump sum payment up front, because there was no actual exchange of power for consideration. However, when the future power sales under the new power contracts are completed at the newly 'bought-down' price, the WRC should receive a percentage of both: (1) the proceeds obtained by the lessee from the sale of power at the bought-down price; and (2) a commensurate portion of the lump sum payment that is attributable to price reductions applicable to future power sales under the renegotiated power contracts or rate orders as the sale of power occurs. *See Yates,* 98 F.3d at 1236; *see also Shoshone Indian Tribe of the Wind River Reservation,* 58 Fed. Cl. at 88 n. 10. This remedy both adheres to the plain meaning of the lease agreements and eliminates a lessee's incentive to circumvent a rental clause, which demands a percentage of revenue received from power sales, by negotiating for large lump sum payments while reducing the future price of power.

We remand this case to the superior court to determine what portion of the lump sum payments attributable to future price reductions currently is due to the WRC pursuant to the rental payment structure. The record is not clear as to the amount of power PSNH has already purchased under the new rate orders; if PSNH has taken only a portion of the anticipated power sales at the new bought-down price, then the WRC is only entitled to the applicable percentage based upon the differential between the old rate orders and the new rate orders for the power already purchased. In the future, the defendants shall pay to the WRC, in addition to the applicable percentage of the new rate orders, the differential between the old and new rate orders, as the power is sold. *See Yates*, 98 F.3d at 1236.

In view of our holding that the WRC has a contractual right to a percentage of the lump sum payments upon the actual sale of power at the reduced rate orders, we need not address the WRC's remaining claims.

*Affirmed in part; reversed in part; and remanded.*

BRODERICK, C.J., and NADEAU, DUGGAN and GALWAY, JJ., concurred.