Rockingham
No. 2004-314

## DAVID A. POPE AND SUZANNE M. POPE, INDIVIDUALLY AND AS TRUSTEES OF THE DAVID A. POPE 1990 REVOCABLE TRUST AND THE WOODIE 1990 REVOCABLE TRUST

### v.

### NANCY MORAN LEE

Argued: February 16, 2005
Opinion Issued: June 3, 2005

*Flagg Law, PLLC*, of Portsmouth (*Jonathan M. Flagg* on the brief and orally), for the plaintiffs.

*Taylor & Keane, P.C.*, of Portsmouth (*Thomas M. Keane* and *Douglas W. Macdonald* on the brief, and *Mr. Keane* orally), for the defendant.

BRODERICK, C.J. The defendant, Nancy Moran Lee, appeals an order of the Superior Court (*Coffey*, J.) ruling that because a 1998 lease agreement between herself and the plaintiffs, David A. Pope and Suzanne M. Pope, individually and as trustees of the David A. Pope 1990 Revocable Trust and the Woodie 1990 Revocable Trust, did not confer upon her the right to perpetual renewals of the lease, she was a tenant at will. We issued an opinion, on April 8, 2005, reversing the superior court. The plaintiffs filed a motion for reconsideration. We granted that motion in part, and withdrew our original opinion. We now reverse.

The following facts were found by the trial court or appear in the record. The plaintiffs own a seasonal ice cream and food service establishment located in North Hampton and known as the "Beach Plum Ice Cream Shop." The defendant leased the premises from 1993 to 1997 under several different annual lease agreements, most of which contained virtually identical terms, and the last three of which ran for eight-month terms starting in May and ending in December. Between 1993 and 1997, the plaintiffs, on several occasions, unsuccessfully applied for a variance to

expand the food menu offered on the premises. *See Pope v. Little Boar's Head Dist.*, 145 N.H. 531 (2000).

On July 22, 1998, the parties executed a new lease that ran for approximately six and one-half months, starting on May 1, 1998, and extending to November 15, 1998. Article 2.2 of the 1998 lease, entitled "Option to Renew," provided:

> The [defendant] shall have the option to renew this lease in 1999 and automatically thereafter with certain exceptions stated herein. The lease payment schedule will be determined by the outcome of the legal action being taken against the Town Of North Hampton, New Hampshire on July 27, 1998. If the case is determined by the courts to be in favor of [the plaintiffs], the rent shall be increased to reflect [the defendant's] flexibility in offering to its customers a larger menu. After said increased [*sic*] has been established, then all subsequent lease years after this rent increase shall be calculated using the applicable "CPI [consumer price index] INDEX" mutually agreed upon by [the parties]. The CPI Index can be either the US CPI or the BOSTON CPI or an average of both. [The defendant] must notify [the plaintiffs] by February 1st if the lease will not be renewed. Any automatic lease renewal must be subject to the following clause[:] In the unlikely event that anyone [*sic*] of our four children should be beset by a financial crisis and be forced by necessity to operate the icecream [*sic*] stand as a source of survival income, then the lease would terminate. NOTE! This clause would only take effect in a desperate situation as none of our children wish to operate the stand.

The lease also contained a "tax escalator" clause, under which the defendant was responsible for fifty percent of any real estate tax increase above the 1998 base year amount of $8,648.22. A "rental modification" clause in the lease provided:

> [The plaintiffs are] currently proceeding with [their] plans to take the Town Of North Hampton to court over the "menu" issue. It is understood and agreed upon by both the [plaintiffs] and the [defendant] that should the [plaintiffs] be awarded a favorable judgment to change the menu and thereby allow the [defendant] to offer other food items, [the defendant] agrees to pay [the plaintiffs] an additional $1,000 of rental. The gross adjusted rental for the "season" shall therefore be $18,000. If a favorable

judgement is not rendered by August 10th, 1998 allowing a menu change, then this clause is null and void for the 1998 season.

The plaintiffs did not receive a favorable judgment by August 10, 1998, and, therefore, the defendant paid the plaintiffs $17,000 to rent the premises for the 1998 term.

The defendant again leased the premises in 1999. The 1999 lease agreement contained substantially the same provisions as the 1998 agreement, and was signed only by the defendant. The first sentence of article 2.2 of the 1999 lease, the renewal provision, was, in substance, identical to the 1998 lease: "The [defendant] shall have the option to renew this lease in 2000 and automatically thereafter with certain exceptions stated herein." Although the word "option" was crossed out and the word "right" was written in, the change was initialed only by the defendant. An asterisk at the end of the sentence referred to a handwritten note inserted below the renewal provision that read: "The lease shall automatically renew each and every year unless [the defendant] provides the [plaintiffs] with notice of [her] intent to terminate prior to March 15[th] of any year." Both the defendant and David A. Pope initialed the foregoing note. Additionally, the record contains a letter dated June 14, 1999, from David Pope to the defendant, which discussed several items appearing in the 1999 lease and which read, in relevant part: "The lease shall use the words [*sic*] 'option' rather than 'right,' but the terms and general conditions will stay the same."

The 1999 lease contained several handwritten changes, only some of which were initialed by both parties. Despite the lack of mutually initialed changes and the fact that only the defendant signed the lease, the parties treated the 1999 lease as a renewal of the 1998 lease. Pursuant to the rental modification provision in the 1999 lease, the defendant paid the plaintiffs an additional $1,500 in rent as a result of the plaintiffs having obtained a favorable judgment in the menu litigation with the Town of North Hampton.

On April 3, 2000, the parties again renewed the 1998 lease agreement, this time by executing a document entitled "Lease Amendment." The 2000 amendment was "made part of the lease agreement dated July 22, 1998" and contained both a rental increase and a rental adjustment clause. Under the rental increase provision:

Both parties agree that the annual increase in ***"base rental"*** shall be calculated at a 3.5% annual increase for the "2000 summer season rental year" AND for future rental seasons. This will alleviate any confusion over "how" to calculate the increase.

> The 50% share in any [real estate] tax increase shall remain as stated in the 1998 lease agreement.

The rental adjustments section provided for a prorated decrease in rental payments in the event this court reversed the trial court's decision in *Pope v. Little Boar's Head District*.

On June 1, 2001, the parties renewed the 1998 lease a third time by executing a document titled "Ice Cream Shop Lease Addendum." The 2001 addendum was "made part of the lease agreement executed on July 22, 1998 and the Lease amendment dated April 3, 2000." The 2001 addendum contained rent and tax figures for the 2001 season only, and specified that the plaintiffs or their agent would be forwarding to the defendant "new language pursuant to the legal issues surrounding the food menu."

In July 2001, the plaintiffs and the Little Boar's Head District entered into a settlement agreement to resolve the menu litigation, pursuant to which the plaintiffs were permitted to expand the menu to serve additional items on the premises. On April 15, 2002, the plaintiffs, through their attorney, forwarded to the defendant a new lease agreement for the 2002 term. The 2002 lease agreement extended the lease term from six and one-half months to seven months, and established the rent at $30,000, an approximate $9,000 increase from the previous year. The 2002 lease did not contain an option to renew provision, and the plaintiffs explained that they would discuss with the defendant, at the end of each season, renewal for the following year.

The defendant informed the plaintiffs that she did not agree with the terms of the 2002 lease, and refused to pay rent above the amounts established in the 1998 lease agreement and addenda. After several discussions regarding the 2002 lease agreement, the defendant ultimately refused the plaintiffs' terms. The plaintiffs then brought a declaratory judgment action against the defendant in the superior court, seeking, among other things, a determination that the 1998 lease agreement did not confer upon the defendant a right to perpetual renewals of the lease. Following a three-day bench trial, the court ruled that the 1998 lease agreement did not give the defendant such a right:

> [T]he Court concludes that the language of the option to renew in section 2.2 conferred upon the [defendant] the right to one renewal in 1999, and any renewal of the terms of the 1998 lease after 1999 was by mutual consent of the parties, not any entitlement by the [defendant] to perpetual renewals. Under the terms of the 2001 renewal of the 1998 lease, the [defendant's] right to possession of the premises terminated November 15, 2001, with the expiration of that year's term. In short, the

[defendant] has been a holdover tenant since the expiration of the 2001 term.

This appeal followed.

On appeal, the parties do not challenge the trial court's ruling that the 1998 lease agreement did not confer upon the defendant the right to perpetual renewals. Indeed, the defendant's appeal is based upon her contention that the 1998 lease agreement is *not* a perpetual lease. The plaintiffs, in objecting to the appeal, agree, and maintain that the trial court's ruling should therefore be upheld. Consequently, we are not asked to determine whether the trial court correctly ruled that the lease does not create a right to perpetual renewals. Rather, the issue we must resolve is whether the trial court, having determined that the lease did not create a right to perpetual renewals, erred in concluding that the defendant was a tenant at will. The defendant argues that the trial court erred because although the 1998 lease agreement did not create a right to perpetual renewals, it nevertheless, by its plain language, entitled her to renewals in 1999 and thereafter without the need for additional writing. We agree.

 A lease is a form of contract that is construed in accordance with the standard rules of contract interpretation. *190 Elm St. Realty v. Beaudoin*, 151 N.H. 205, 206 (2004). Because the meaning of a lease agreement is ultimately a matter of law for this court to decide, including the determination of whether a term is ambiguous, *see N.H. Water Res. Council v. Steels Pond Hydro*, 151 N.H. 214, 215 (2004), we review the trial court's interpretation of a lease agreement *de novo*, *see LeTarte v. West Side Dev. Group*, 151 N.H. 291, 294 (2004). We will give the language used by the parties its common meaning as understood by reasonable people and, in the absence of ambiguity, we will determine the parties' intent from the plain meaning of the language used. *N.H. Water Res. Council*, 151 N.H. at 215.

 In the context of perpetual leaseholds, we have stated that we will "[enforce] parties' intent to create a perpetual leasehold where, despite the absence of formal language in the grant, the agreement of the parties clearly show[s] such an intent." *Bussiere v. Roberge*, 142 N.H. 905, 909 (1998). We adopt the *Bussiere* standard for determining whether the lease in this case gave the defendant the right to renew the lease agreement in 1999 and thereafter. We conclude that the lease agreement gave the defendant such a right because "the agreement of the parties clearly showed such an intent." *Id.*

 Article 2.2 provides that the defendant "shall have the option to renew this lease in 1999 and automatically thereafter." In common usage,

the term "automatically" means "in an automatic manner: without thought or conscious intention." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 148 (unabridged ed. 2002). "Automatic" means "involuntary either wholly or to a major extent so that any activity of the will is largely negligible: of a reflex nature: without volition." *Id.* Thus, the common meaning of the term "automatically," read in the context of article 2.2, plainly and unequivocally demonstrates that the parties intended to create a right to continual renewals. *Cf. In re Mackie's Petition*, 125 N.W.2d 482, 485 (Mich. 1963) (finding perpetual lease, renewable every 10 years at lessee's discretion, where renewal provision stated that "lease shall be automatically renewed").

The plaintiffs argue that the term "automatically" is ambiguous because: (1) it could indicate the parties' intent to use the same lease form as that used in 1998 for each term of the lease thereafter, to save them from having to review new documents every year; (2) the lease provides for an option, as opposed to a right, to renew; (3) multiple provisions in the lease conflict with a perpetually renewable lease; (4) the amount of future rent is not established in the lease; and (5) the parties' actions subsequent to executing the 1998 lease agreement demonstrate ambiguity. The plaintiffs' arguments are all based upon the premise that the issue in this case is whether the 1998 lease agreement creates a perpetual leasehold. We have determined that the lease agreement gave the defendant the right to renew the lease in 1999 and thereafter. However, because the standard we employ to decide whether the lease in this case created a right to continual renewals is similar to that which we use to decide whether a lease agreement creates a perpetual leasehold, *see Bussiere*, 142 N.H. at 909, we address their arguments. In doing so, we conclude that none of the issues raised by the plaintiffs warrants a finding that the defendant is not entitled to renew the lease in 1999 and thereafter.

The plaintiffs argue that article 2.2 is ambiguous because it could be construed as merely demonstrating the parties' intent to use the same lease form as that used in 1998 for the 1999 term and thereafter, to save them from having to review new documents every year. As discussed, however, the common meaning of the term "automatically," read in the context of article 2.2, plainly and unequivocally reflects the parties' intent to create a right to continual renewals of the lease. Therefore, we reject the plaintiffs' argument.

■ The plaintiffs next contend that the parties' use of the clause "option to renew," rather than "right to renew," renders the term "automatically" in article 2.2 ambiguous. We disagree. In this context, the term "right" is synonymous with the term "option." The term "automatically" reverses

the usual burden of exercising an option; typically, the lessee must notify the lessor by a date certain if the lessee wishes to renew a lease. However, if the defendant, the lessee in this case, wants to renew her lease with the plaintiff lessors, she need not do anything. She only needs to notify the plaintiffs by a date certain if she chooses *not* to renew the lease. Thus, while silence in the former instance causes a lease to expire, it renews the lease in the latter instance. In both instances, however, whether to renew the lease is an option left to the lessee. Accordingly, the parties' use of the term "option," rather than "right," does not render article 2.2 ambiguous.

Next, the plaintiffs contend that multiple provisions in the lease conflict with a perpetually renewable lease. They argue that the restriction on the use of the property contained in article 4.1, requiring that the defendant "use and occupy the premises for the sole purpose of retail sales of food items," conflicts with the notion that article 2.2 creates a right to perpetual renewals. Courts in several States have concluded that a lease provision imposing a restriction on the lessee's use of the premises indicates that the parties to the lease did not contemplate perpetual renewals. *See, e.g., Geyer v. Lietzan,* 103 N.E.2d 199, 201 (Ind. 1952); *Drink, Inc. v. Martinez,* 556 P.2d 348, 352 (N.M. 1976); *Oak Bay Prop. v. Silverdale Sportsman's Center,* 648 P.2d 465, 467 (Wash. Ct. App. 1982). In *Geyer,* the court explained its conclusion:

> The use to which the lessee may put the premises is restricted to "conducting a general merchandising business," which would not seem to be a covenant such as one would expect to find in a lease in perpetuity. Construed as a lease in perpetuity it could serve to tie up this property forever for one particular and narrow use, regardless of whether, after the passing of many years, the location might make the property much more useful and valuable for other purposes.

*Geyer,* 103 N.E.2d at 201.

This reasoning does not persuade us. A property owner may require that his or her property be restricted to any use that he or she sees fit, within the confines of the law, and that any lease be subject to those restrictions. Thus, if a lessor wishes to put the property to a certain use and maintain that use, so long as the use does not violate the law, he or she has the right to do so. Moreover, it appears to us that where, as here, the language of a lease plainly and unequivocally indicates the parties' intent to confer upon a lessee the right to continual renewals, a restriction on a lessee's use of property should not be construed as defeating that intent.

■ The plaintiffs also cite article 5.5 as conflicting with a right to perpetual renewals. That provision states:

> [The defendant] shall at [her] sole cost and expense maintain in a clean and sanitary condition and a good state of repair, all other portions of the premises, including but in no way limited to all plumbing, sewerage, air conditioning, wiring, glazing, windows, doors, floors, ceilings, interior walls, painted or otherwise; reasonable wear and tear accepted [*sic*]. The exception of reasonable wear and tear shall not apply so as to permit the [defendant] to keep the premises and equipment and other personal property of the [plaintiffs] therein in anything less than suitable, tenantable and in good condition as it was at the commencement of this Lease.

Provisions requiring a lessee to return the premises to the lessor in as good a condition as when originally let have been construed as conflicting with a right to perpetual renewals. *See id.*; *Drink, Inc.*, 556 P.2d at 352. However, we construe article 5.5 as simply protecting the plaintiffs' property interests. Article 5.5 accomplishes this by requiring that the defendant maintain certain property in as good a condition as when the lease commenced, wear and tear excepted. Thus, we see no conflict between articles 2.2 and 5.5 in the context of whether a lease creates a right to continual renewals.

■ The plaintiffs argue that article 2.1, providing for a "term" of the lease, conflicts with a right to perpetual renewals. Specifically, they assert that because the property is seasonal, there is no need for a "term" in the lease agreement. We disagree, and find that the very nature of the property as a seasonal property justifies the need for a "term" to be defined in the lease agreement, regardless of whether the lease agreement purports to grant a right to continual renewals. Therefore, the provision for a "term" of the lease under these circumstances does nothing to change the fact that article 2.2 grants the defendant the right to renew the lease in 1999 and thereafter.

Finally, the plaintiffs cite to article 17 of the 1998 lease agreement and argue that it conflicts with a right to perpetual renewals. Article 17 provides:

> In the event that [the defendant] shall continue in occupancy of the demised premises after the expiration of the term, such occupancy shall not be deemed to extend or renew the term of this Lease, but such occupancy shall continue as a tenancy at will from month to month upon the covenants, provisions and

conditions herein contained [in] the rental in effect during the last Lease year of the term, prorated and payable for the period of such occupancy.

Article 2.1 of the 1998 lease agreement defines "the term" as six and one-half months, commencing on May 1, 1998, and ending on November 15, 1998.

■ We conclude that article 17 does not conflict with the notion that article 2.2 creates a right to continual renewals. The defendant could, in any given year, opt not to renew her lease of the premises by providing the plaintiffs proper notice. Should she choose not to renew, and should she fail to vacate the premises, she would be a tenant at will under the terms of article 17.

Next, the plaintiffs argue that the lease is ambiguous because the amount of future rent is not established therein. Article 3.2 of the 1998 lease agreement set forth the lease payment schedule for the 1998 term, and article 21 contained a rental modification provision that increased the 1998 rent by $1,000 in the event that the plaintiffs received a favorable judgment in the menu litigation by August 10, 1998. The 2000 amendment, which the parties expressly made part of the 1998 lease agreement, contained a provision under which rent was to increase at a rate of 3.5 percent per year for the 2000 rental term "and for future rental seasons." Furthermore, according to the 2000 amendment, "[t]he 50% share in any tax increase shall remain as stated in the 1998 lease agreement." The 2001 addendum simply breaks down the rental payment calculation for the 2001 term. Our review of these provisions reveals that the 1998 lease agreement establishes future rent. *Compare Giacobbi Square v. PEK Corp.*, 670 P.2d 51, 53 (Idaho 1983) (renewal clause enforceable where formula for rent was capable of being reduced to a "sum certain"), *with McCormick v. Brockett*, 306 S.E.2d 344, 345-46 (Ga. Ct. App. 1983) (renewal provision "too vague, indefinite and uncertain to be enforceable" where rent was to be "the same rental as may have been offered Lessor by any other reputable person").

The plaintiffs next argue that article 2.2 is ambiguous because, subsequent to executing the 1998 lease agreement, the parties negotiated a new lease in 1999, and then executed, without consideration, several amendments to the 1998 lease. We are not persuaded by this argument. As for the 1999 lease, the plaintiffs contend that if the defendant truly believed the 1998 lease agreement was "long term," she "could have said in 1999 that she already [had] a long term lease and there [was] no reason to negotiate a new lease. She did not." Regardless of the fact that the parties negotiated a new lease agreement in 1999, however, they reverted to the 1998 lease agreement in 2000 and 2001. Thus, we find it irrelevant that the

parties negotiated a lease agreement in 1999. As for the amendments to the 1998 lease, the plaintiffs offer no explanation as to why amending a lease that creates a right of continual renewals negates that right where the amendments have no bearing on the renewal provision.

In sum, we hold that based upon the plain and unequivocal language of article 2.2 of the 1998 lease agreement, the defendant has the right to continually renew her lease of the premises. Thus, the trial court erred as a matter of law in ruling that the defendant is a tenant at will.

The plaintiffs contend that even if we conclude that article 2.2 gave the defendant the right to perpetual renewals of the lease, we should nevertheless affirm the trial court because: (1) the lease fails for want of a material term; (2) article 2.2 is not reasonable in light of the justifiable interests of the parties; (3) the option to renew fails for lack of consideration; (4) the option to renew is unconscionable; (5) the defendant rejected the renewal and breached the terms of the lease, thereby terminating the lease; and (6) the option to renew fails for lack of a meeting of the minds. As with the plaintiffs' arguments discussed above, these contentions are framed in terms of a perpetual leasehold, which we have determined is not at issue in this case. However, because we have determined that the *Bussiere* standard applies to continual renewals, we address each of the plaintiffs' contentions in turn.

The plaintiffs argue that because the lease and amendments thereto clearly leave the issue of rent to future negotiations, the lease fails for want of a material term. We disagree. As discussed, the amount of future rent is established in the lease.

Next, relying on *Horse Pond Fish & Game Club v. Cormier*, the plaintiffs argue that article 2.2 is not reasonable in light of the justifiable interests of the parties. They describe their justifiable interests as ensuring that the premises are "free to be sold, to be refinanced, or to gain a higher income from increased rent." They state that although the defendant "indicated she wanted a long term lease to be able to recover her investment in the business ... [she] has been unable to identify or quantify any significant investment in the property or the business."

In *Horse Pond Fish & Game Club*, we stated:

> Much of modern property law operates on the assumption that freedom to alienate property interests which one may own is essential to the welfare of society. Because all restraints against alienation are contrary to this policy of freedom of alienation, to be enforceable they must be reasonable in view of the justifiable interests of the parties. Correspondingly, unreasonable restraints will be held invalid.

*Horse Pond Fish & Game Club v. Cormier,* 133 N.H. 648, 653 (1990) (quotation and citations omitted). Even assuming the plaintiffs are the only parties with legitimate justifiable interests, the 1998 lease agreement granting the defendant the right of continued renewals does not offend the law stated in *Horse Pond Fish & Game.*

 The defendant's right to renew the lease in 1999 and thereafter does not foreclose the plaintiffs from selling the premises. It is not unreasonable to believe that potential buyers may desire to purchase a business that is already fully in operation and occupied by a paying tenant. The plaintiffs offer no discussion as to why they believe they would not be able to refinance the property should the defendant have a right to continual renewals. As to their argument that they have a justifiable interest in gaining a higher income from increased rent, we note that, as discussed, the plaintiffs incorporated rental increase provisions into the 1998 lease agreement. They cannot now relieve themselves of a binding agreement to confer continual renewals upon the defendant on the basis that they now, in hindsight, believe that they did not demand sufficient rental increases.

Next, the plaintiffs contend that the option to renew fails for lack of consideration. Specifically, they maintain that because the renewal provision was executed part way through the 1998 lease term, additional consideration was required to render the provision a binding agreement rather than an offer to lease that could later be withdrawn. In arguing this point, however, the plaintiffs ignore the fact that the renewal provision was part of the 1998 lease agreement. Therefore, no additional consideration was required. *See Metropolitan Park Dist. v. Griffith,* 723 P.2d 1093, 1099 (Wash. 1986) (en banc); *Parham v. Glass Club Lake, Inc.,* 533 S.W.2d 96, 97 (Tex. App. 1976) (general rule is that option to renew contained in lease is supported by consideration for lease).

 The plaintiffs next argue that the option to renew is unconscionable and therefore unenforceable:

> [The defendant] claims that the [plaintiffs] must lease the property to her for as long as she wants it, but she is free to walk from the property in any year she so chooses. [The defendant] claims that the [plaintiffs], after spending in excess of $10,000 suing the Town of North Hampton, can only increase her rent once in the amount of $1,500 as a result of said lawsuit. Both claims, if true, would make the contract between the parties unconscionable and therefore unenforceable.

We disagree. By its very nature, an option to renew belongs to the lessee: it is an option granted to a lessee by a lessor, and is maintained at the lessee's discretion. Accordingly, the fact that the defendant may renew her lease of the property for as long as she likes, and may choose, in any given year, not to renew, does not render the lease agreement unconscionable. Furthermore, the plaintiffs' claim that after spending over $10,000 litigating the menu issue with the Town of North Hampton, a single $1,500 increase in rent renders the lease unconscionable, is not persuasive. There is nothing on the face of the rental increase provision that renders the lease agreement unconscionable. Additionally, the 2000 amendment, made part of the 1998 lease agreement, provides for an annual three and one-half percent increase in rent for the 2000 rental season and thereafter.

Next, the plaintiffs contend that the renewal provision is unenforceable because the defendant rejected the renewal, thereby breaching the lease and terminating it. Specifically, they note that in 2002, the defendant refused to pay increased rent, despite the plaintiffs having resolved the menu litigation in 2001 in favor of allowing an expanded menu on the premises. They maintain that even if the defendant was not obligated to pay increased rent in 2002, she nevertheless breached the lease by failing to pay increased taxes on the property in 2002 as required by the 1998 lease agreement.

The defendant was not obligated to pay increased rent as a result of the favorable resolution of the menu litigation. In 1999, pursuant to a rental modification clause contained in the 1999 renewal lease, the defendant paid the plaintiffs an additional $1,500 in rent because the plaintiffs received a favorable judgment in the menu litigation. The 2000 amendment, expressly incorporated into the 1998 lease agreement, provided, in relevant part:

> In the unlikely event the Supreme court reverses its decision *from* "permitting the ice cream shop" to sell an expanded food menu *"to"* only selling hot dogs, then in this event, the rent shall be adjusted downward on a pro-rata basis not to exceed $1,500. The "period of time" used to calculate the pro-rata amount shall be 90 days; (JUNE, JULY, AUGUST.)

Paragraph four of the 2001 addendum provided that the plaintiffs and their agent would forward to the defendant "new language pursuant to the legal issues surrounding the food menu." Additionally, paragraph four specified that the addendum "focus[ed] solely on the 3.5 percent annual rental increase and [did] NOT address any other financial issues, or judicial food menu decrees." Nothing in the provisions recounted above obligated the defendant to pay increased rent according to the terms of the plaintiffs' 2002 offer.

Furthermore, the record does not reveal that the defendant failed to pay increased taxes on the property as required under the 1998 lease agreement. To the contrary, the trial court found that a cover letter that accompanied the proposed 2002 lease stated that the tax escalator clause contained in the lease "would have no effect on the [defendant] for the 2002 term, presumably because there was no increase in taxes from the previous year." Accordingly, we conclude that the defendant did not breach the lease by failing to pay increased rent and taxes.

The plaintiffs argue that the renewal provision fails for lack of a meeting of the minds because rent, an essential term, was left open for negotiation. We disagree. As discussed, the parties agreed on rent and did not, as the plaintiffs argue, leave the issue of rent open to future negotiations.

Finally, the plaintiffs maintain that the renewal provision is not enforceable because the evidence in this case reveals that the plaintiffs never intended to confer upon the defendant the right to perpetual renewals. As stated, the issue in this case is not whether the parties intended to create a perpetual leasehold; the issue is whether they intended to create a right to continual renewals. As discussed, none of the lease provisions cited by the plaintiffs conflict with the notion of continual renewals. Moreover, as determined, a plain reading of article 2.2 reveals the parties' intent to create a right to continual renewals. Accordingly, our review of the 1998 lease agreement in its entirety reveals that the agreement clearly shows that the parties intended to create a right to continual renewals. *See Bussiere*, 142 N.H. at 909. Thus, the trial court erred in concluding that because the lease did not create a right to perpetual renewals, the defendant was a tenant at will.

*Reversed.*

NADEAU, DALIANIS, DUGGAN and GALWAY, JJ., concurred.