Strafford
No. 2010-275

WINECELLAR FARM, INC.

v.

LEONA HIBBARD & a.

Argued: April 13, 2011
Opinion Issued: July 21, 2011

*Steiner Law Office, PLLC*, of Concord (*R. James Steiner* on the brief and orally), for the petitioner.

*McNeill, Taylor & Gallo, P.C.*, of Dover (*R. Peter Taylor* on the brief and orally), and *Bosen & Associates, PLLC*, of Portsmouth (*Christopher P. Mulligan* on the brief), for the respondents.

LYNN, J. The petitioner, Winecellar Farm, Inc. (Winecellar), appeals an order of the Superior Court (*Brown*, J.) ruling that it was not entitled to: (1) a decree *pro confesso* awarding it specific performance to purchase the Bedard Farm; (2) specific performance to purchase the Bedard Farm under the doctrine of part performance; and (3) continue haying activity in perpetuity under a lease agreement. The respondents, thirteen individual heirs of Eva Bedard's estate, cross-appeal, arguing that the trial court erred by: (1) awarding Winecellar a purchase right regarding certain buffalo pastures; and (2) failing to order Winecellar to turn over lease payments for its use of the pastures during the litigation. We affirm in part, reverse in part, and remand.

I

We set forth the facts surrounding the relationship between Winecellar and Leo and Eva Bedard, the former owners of the Bedard Farm in Durham, as found by the trial court or as otherwise supported in the record. The Bedards were siblings who lived their entire lives on the Bedard Farm until they passed away in 2006. Neither ever married. In 1992, Craig and Jennifer Rief purchased Winecellar, a working farm adjacent to the Bedard Farm. (Hereinafter, Winecellar and the Riefs are used interchangeably.) The Riefs began living on their property in 1998, and enjoyed a close, friendly relationship with the Bedards.

The Riefs informed the Bedards on multiple occasions of their interest in buying the Bedard Farm when the Bedards were ready to sell it and, until that time, in farming both properties together. They first proposed buying the property in writing on September 28, 1997, offering to purchase it for $350,000 and to give the Bedards a life tenancy. The offer was not accepted. In November 2003, Winecellar offered to lease the Bedards' land, in order to cut hay, in exchange for a monthly payment of $500 and winter maintenance of the Bedards' driveway. A proposed "Land Lease" was attached to the letter; the Bedards did not sign it.

On May 1, 2004, Winecellar and Ms. Bedard signed a "Memorandum of Understanding to Harvest Hay" (Haying Agreement), providing that Winecellar would "harvest hay throughout the appropriate times of the year" from the Bedard Farm, and maintain and harvest the fields in accordance with certain practices. In exchange, it would be responsible for

maintaining certain access ways and roadways, including snow removal from the driveway. Additionally, the Haying Agreement provided: "Bedards agree to allow Winecellar Farm to continue this activity every year in perpetuity as long as Winecellar Farm maintains the access ways, roadways and insurance coverage in accordance with the terms and conditions of this agreement." Later in 2004, Winecellar proposed leasing part of the Bedard Farm to pasture buffalo, but the Bedards declined the offer.

By letter dated July 24, 2004, the Riefs expressed their "apologies [for] mov[ing] too fast in asking [the Bedards] to lease [them] land for the buffalo," and stated: "we would still be interested to lease your land for a monthly payment (maybe the back field . . .), or eventually buy your property when you feel the time is right." The letter also stated:

> We have always had the impression that you would consider us when it came time to sell your property and we would pay you whatever price you wanted. We also respected your need to make your decision in due time. . . .
>
> . . . Please let us know if you are still considering us as the buyer of your property — it would mean a lot to our family for our dream to merge the two farms.

About two months later, by letter dated September 27, 2004, entitled "Land Lease for Winecellar Farm to pasture buffalo," the Riefs set forth an understanding between the parties for Winecellar to use two back fields on the Bedard Farm to pasture a buffalo herd in exchange for payments of $200 per month (Pasture Agreement). The Riefs began paying the Bedards $200 per month, invested a significant amount of money in fencing and other equipment in order to pasture buffalo on the leased land, and purchased a number of buffalo. The following year, the Riefs expressed their desire to put in writing their understanding that they could purchase the Bedard Farm at some point in the future. A note accompanying the September 2005 "lease payment" stated in part:

> Your property is obviously very meaningful to us for the purpose of raising buffalo and fulfilling our long-term commitment to keep our property and yours as working farms. We would not be able to support the buffalo if we lost access to your property. With that said, I have greatly appreciated your verbal commitments in the past to sell us the property at a time and price acceptable to you, but was hopeful that you would consider documenting this in writing.
>
> . . . .

. . . I have enclosed a Letter of Understanding that would document your intention to sell us the property at a time and price acceptable [to] you. This is not an obligation to sell. It simply documents the verbal commitment we have made to each other, for us to purchase your property when you do decide to sell. . . .

I have invested a lot of time and effort in raising the buffalo, including the purchase of new haying equipment. Having our intentions in writing would give me peace of mind, as I am sure it would you too. If this Letter of Understanding is acceptable to you, please sign one copy and return it to me in the self-addressed stamped envelope.

The attached "Letter of Understanding" set forth terms under which the Riefs would pay $200 per month in exchange for the Bedards' promise to sell them the property "at a time and price acceptable to owner" and for the opportunity to match any third-party offer. The Bedards did not sign the letter, and the Riefs continued to pay the Bedards $200 per month.

In January 2006, the Riefs offered to pay "an additional $200 per month" to fence more land for pasturing the buffalo. Further, they again sought written confirmation of their ability to purchase the Bedard Farm in the future; the note accompanying the February "lease payment" stated:

As we have discussed in the past, I would like to acquire your property when you are ready to sell it to support the buffalo and to maintain the property as an operating farm. I have enclosed a Letter of Understanding and an additional $200 for your consideration. If this is acceptable to you, please sign both copies of the letter on behalf of yourself and Leo and return one copy to me in the self-addressed envelop[e].

The attached "Letter of Understanding" provided that "[i]n consideration of the sum of an additional $200 per month paid under the current land lease (for a total of $400 per month)," the Bedards would agree to sell their farm to the Riefs "at a time and price acceptable to Eva Bedard and Leo Bedard." The Bedards did not sign the letter. The Riefs thereafter paid the Bedards $400 per month; they identified each payment as a "land lease payment" until after Eva Bedard's death.

On March 11, 2006, Leo Bedard died. Later that month, in a note to Eva Bedard accompanying the April "lease payment," the Riefs again expressed their desire to purchase the property, stating, "As we have discussed on several occasions, I would like to acquire your property when you are ready to sell it," and

You mentioned the other day that you don't know how you could possibly repay us for everything — you don't have to. All I ask is that you consider us when you do decide to move. If it would help you, Jennifer and I would be more than happy to buy the property and let you stay for as long as you would like.

The attached "Letter of Understanding" was identically worded to the January 2006 proposal, with the exception that it did not contain Mr. Bedard's name. The document reflects that Mr. Rief, Mrs. Rief and Ms. Bedard all signed the letter on April 8, 2006. The signed letter shows that "Stephen Hoginski" witnessed all three signatures. However, Mr. Hoginski was not present when Ms. Bedard signed the document, but instead signed it as a "witness" hours later outside of her presence. Approximately three months later, on June 27, 2006, Ms. Bedard died. The Riefs subsequently recorded the signed "Letter of Understanding" in the registry of deeds.

Ms. Bedard's will executed in December 2005 provides for the Bedard Farm to pass to her nieces and nephews in accordance with a residual property clause. In November 2006, Winecellar filed a petition for a preliminary injunction seeking to preclude her estate from evicting its herd of buffalo and removing fencing equipment maintained on two pastures on the Bedard Farm. It alleged that "[t]hree separate written agreements" governed its rights, including a Haying Agreement, Pasture Agreement and a Purchase and Sale Agreement executed in April 2006. After the trial court granted the motion for preliminary injunction, Winecellar filed an amendment seeking to compel the estate to convey to it the Bedard Farm based on the doctrine of part performance and on a purchase and sales agreement. In August 2009, Winecellar filed an emergency motion to add the individual heirs of the estate as necessary parties and to add a quiet title claim against them. The trial court ordered the heirs to file a written appearance by a date certain and "a plea, answer, demurrer or other response" by November 6, 2009. Although the respondents filed appearances, they did not timely file responsive pleadings. Subsequently, based on the failure of the heirs to timely file an answer, Winecellar moved for a decree *pro confesso* entitling it to purchase the Bedard Farm for its then-current fair market value. The trial court denied the motion and also ordered a voluntary nonsuit as to the estate.

In February 2010, following a bench trial, the trial court "declin[ed] to order the Estate to sell the Bedard Farm to Winecellar[,] [found] that the Pasturing and Haying Agreements are not enforceable against the Estate," and ruled that "Winecellar will be permitted to purchase the buffalo pastures for their highest and best value if it so chooses." Winecellar moved for reconsideration, arguing among other things that the respondents

failed to answer the amended complaint, entitling it to a decree *pro confesso* on its request for specific performance. Other than correcting a scrivener's error in its order, the trial court denied the motion for reconsideration. Some of the respondents also filed a limited motion to reconsider, arguing that the court erred when it granted Winecellar the right to purchase the buffalo pastures and when it declined to order Winecellar to turn over to the estate the rental payments for use of the pastures during the pendency of the litigation. The record before us does not contain the trial court's order on this motion. Winecellar appealed, and the respondents cross-appealed.

## II

Winecellar first argues that the trial court erred by refusing to grant a decree *pro confesso* pursuant to Superior Court Rule 131 when the respondents failed to timely file a response to its motion to add them as necessary parties and to add a quiet title claim. The respondents contend, however, that the estate had defended against Winecellar's claims since the initial petition was filed in 2006, that Winecellar's motion did not raise new allegations that required a responsive pleading, and that they did not object to being added as parties to the on-going litigation.

When the trial court denied Winecellar's request for a decree *pro confesso* in its motion to reconsider, the court determined: "The failure of the heirs to answer the amended complaint prejudiced no one. This issue was raised pretrial. The Court then and now believes such a request is form and procedure over substance. To close this procedural loophole, the respondents' Motion to Extend Time to Answer the Final Amended Petition is granted and the petitioner's request to correct the decree *pro confesso* is denied." We discern no error in its decision.

Although Superior Court Rule 131 requires a decree *pro confesso* for a respondent's neglect to file an answer ordered by the court, the trial court may exercise its discretion to set aside such a decree "upon such terms as justice may require." SUPER. CT. R. 131. Indeed, the trial court may waive the application of any rule for "good cause" and "as justice may require." SUPER. CT. R. Preface; *see Donnelly v. Eastman*, 149 N.H. 631, 633 (2003).

The allegations underlying Winecellar's request for injunctive relief had been disputed by the estate from the outset of the litigation, and the respondents essentially replaced the estate as responding parties. The trial court found that Winecellar suffered no prejudice from the delayed answer and, notably, in its brief, Winecellar identifies no prejudice. Indeed, Winecellar asserted in its motion to add the heirs as parties that its claims

against the estate and the heirs involved the "very same merits." In short, Winecellar has failed to establish that the trial court erred in denying the requested decree.

## III

Next, Winecellar argues that the trial court erred in failing to grant it specific performance pursuant to the doctrine of part performance, an exception to the statute of frauds. It points to its reliance on oral and written statements made by the Bedards affirming its right to purchase the Bedard Farm, and to its $200 monthly payments toward the purchase right.

The statute of frauds provides: "No action shall be maintained upon a contract for the sale of land unless the agreement upon which it is brought, or some memorandum thereof, is in writing and signed by the party to be charged, or by some person authorized by him in writing." RSA 506:1 (2010). "Its purpose is to promote certainty and to protect from frauds and perjuries in land transactions." *Greene v. McLeod*, 156 N.H. 724, 727 (2008) (quotation omitted). We have recognized, however, that strict enforcement of the statute of frauds "can produce frustration on the one hand, and unethical conduct on the other," and, thus, "the law seeks to alleviate the harshness of the statute when some operating facts, such as fraud, part performance or other equitable considerations, are present." *Id.* at 728 (quotations and brackets omitted).

Winecellar does not claim any writings between the parties were sufficient to satisfy the statute of frauds. Rather, it relies on the doctrine of part performance to seek specific performance of the oral promise it claims the Bedards made to sell it the Bedard Farm. "The part performance doctrine is a judicial device intended to prevent the terms of a formal statute from doing grave injustice." *Id.* (brackets and quotations omitted). The doctrine "effectively withdraws contracts from the operation of the statute of frauds, when application of the statute would result in fraud or irreparable injury on the purchaser who has performed his part of the agreement." *Id.* (citation, brackets, and quotations omitted). The doctrine "is frequently applied to oral contracts for the sale of real estate, where the purchaser has proceeded, either in performance or pursuance of the contract, so far to alter his or her position as to incur an unjust injury and loss." *Id.* (quotations and citation omitted).

We consider three factors in analyzing the sufficiency of the acts performed by the purchaser to determine whether the part performance doctrine applies. *Greene*, 156 N.H. at 728-29. We look to whether the acts are: "(1) in pursuance of the contract and in reasonable reliance thereon, without notice that the defendant has already repudiated the contract; (2)

such that the remedy of restitution is not reasonably adequate, making it very unjust for the defendant to hide behind the statute; and (3) one[s] that [are] in some degree evidential of the existence of a contract and not readily explainable on any other ground." *Id.* at 729 (quotations omitted). "Whether or not particular acts suffice to constitute part performance is a question of law, and is therefore subject to *de novo* review." *Id.* (quotations and citations omitted). However, to the extent a particular element of part performance requires a finding of fact, we will uphold the trial court's decision unless it is not supported by the evidence or is erroneous as a matter of law. *Cf. Sutton v. Town of Gilford*, 160 N.H. 43, 58 (2010) (elements of municipal estoppel require factual determinations that will be upheld unless unsupported by evidence or legally erroneous); *Cardinal Dev. Corp. v. Town of Winchester Zoning Bd. of Adjustment*, 157 N.H. 710, 715 (2008) (trial court's ruling on applicability of equitable estoppel will be upheld unless unsupported by evidence or legally erroneous).

The trial court ruled that the doctrine of part performance did not apply. It is not clear, however, whether the trial court found that the Bedards made an oral promise to sell the Bedard Farm to Winecellar. *See Humiston v. Bushnell*, 118 N.H. 759, 762 (1978) (application of part performance doctrine presupposes the existence of an oral promise). Because the trial court addressed Winecellar's claim of part performance without specifically ruling on the threshold issue of the existence of an oral promise, we follow the same course and assume, without deciding, that there was an oral promise for the sale of the Bedard Farm. Therefore, we review the trial court's ruling on part performance as challenged on appeal.

With respect to the reasonable reliance factor of the part performance doctrine, the trial court found that Winecellar's reliance on "the alleged oral promises the Bedards may have made to them was not reasonable," reasoning that the Riefs "were fully aware that the agreement should have been in writing," expressed concern about being too aggressive in seeking a written agreement, and presented documents to the Bedards on several occasions to memorialize in writing the alleged agreement between them, but none of the documents were ever signed. With respect to the factor relating to evidential existence of a contract, the trial court ruled that the Riefs' actions were readily explainable on a ground other than evidence of the existence of a contract. Specifically, it determined that Winecellar spent money on setting up the buffalo pastures when the parties were negotiating, and later under an agreement, for the pasturing of buffalo on the Bedards' property.

Winecellar contends that the Bedards' repeated verbal assurances to sell it the farm at some point in the future led to the written Haying and Pasture Agreements, and that in reliance on those agreements and the

promise to sell, it took possession of the haying pastures, invested in fencing, and purchased buffalo and haying equipment. It argues that the trial court erroneously concluded that the additional $200 payments it made commencing in January 2006 constituted land lease payments, rather than consideration for the right to purchase the Bedard Farm. Further, Winecellar points to the April 2006 Letter of Understanding signed by Eva Bedard as evidence of its purchase right that it claims was established over the preceding years. We note that the trial court found that Winecellar's reliance was not reasonable in part because the Riefs made their investments with knowledge that an agreement to sell the farm should have been in writing, and Winecellar does not challenge this finding.

The trial court concluded that Winecellar's "expenditures on the buffalo and their accessories are . . . explainable on grounds other than a promise by the Bedards to sell [it] the Bedard Farm," and thus that the written agreements were not dependent on the oral agreement to sell the farm. Winecellar has not established that these conclusions are unsupported by the evidence or legally erroneous. For example, the written agreements themselves make no mention of a promise to sell the farm, and in its July 2004 correspondence, Winecellar expressed its interest to lease the land to pasture the buffalo "*or* eventually buy your property when you feel the time is right." (Emphasis added.) Similarly, the record supports the conclusion that Winecellar's possession of a portion of the farm is readily explainable based on the Haying and Pasture Agreements alone rather than the existence of an oral promise to sell. *See Abbott v. Baldwin*, 61 N.H. 583, 586 (1881) (act of part performance must be such as would not have been done except by reason of the verbal agreement for the conveyance of land, "and must [have been] done with a direct view to its performance; and the agreement set up must appear to be the same with the one partly performed").

Winecellar also has failed to establish that the trial court's conclusion that the additional $200 monthly payments constituted land lease payments, not consideration for a purchase right, is unsupported by the record or legally erroneous. As noted by the trial court, the Bedards did not sign the "Letter of Understanding" that accompanied the January 2006 note, Winecellar's own correspondence described the monies as the "land lease payment[s]," and Winecellar did not identify the payments as "Land Lease and Purchase Agreements" until *after* Ms. Bedard died. Finally, regarding the April 2006 "Letter of Understanding" signed by Ms. Bedard, the trial court refused to enforce the document because "[t]he Riefs had Ms. Bedard's signature witnessed fraudulently, knowing that Mr. Hoginski had not seen Ms. Bedard sign the document, and then recorded the . . . Letter in the Registry of Deeds." Winecellar does not challenge this decision but

relies on the document as evidence of Ms. Bedard's intent to abide by her alleged promise to sell the farm. Given the questionable circumstances surrounding its pedigree, we are not persuaded that this document demonstrates that the trial court erred in ruling that the doctrine of part performance does not apply.

■ Accordingly, we affirm the trial court's decision that the part performance doctrine did not withdraw any oral contract for the sale of land between it and the Bedards from the operation of the statute of frauds.

## IV

Winecellar next argues that the trial court erred by concluding that the Haying Agreement is not a perpetual leasehold. It contends that the plain language of the agreement grants it the right to hay "in perpetuity" consistent with "the ultimate intent that Winecellar Farm would own the Bedard Farm." According to Winecellar, "both the Riefs and the Bedards had justifiable interests being protected by the perpetual lease" in that "[b]oth desired to protect the property from development as other than a farm" and "desired to see the farm continue as an operating farm." The trial court ruled that the relied upon language was not enforceable because it would constitute an unreasonable restraint on alienation of real property. We agree.

■ In considering whether the Haying Agreement constitutes a perpetual leasehold, we are mindful that "[m]uch of modern property law operates on the assumption that freedom to alienate property interests which one may own is essential to the welfare of society." *Horse Pond Fish & Game Club v. Cormier*, 133 N.H. 648, 653 (1990) (quotation omitted). We will enforce the parties' intent to create a perpetual leasehold where the intended restraint is "reasonable in view of the justifiable interests of the parties." *Id.* "[U]nreasonable restraints will be held invalid." *Id.*

■■ "The rule against restraints on alienation is based upon (among other things) the desirability of keeping property responsive to the current exigencies of its current beneficial owner and upon the desirability of avoiding the retardation of the natural development of a community by removing property from the ordinary channels of trade and commerce." *Ventures Stores v. Pacific Beach Co.*, 980 S.W.2d 176, 184 (Mo. Ct. App. 1998) (quotations omitted); *see Metropolitan Transp. v. Bruken Realty*, 492 N.E.2d 379, 381 (N.Y. 1986) (the common law rule against unreasonable restraints serves general purpose of limiting the power of an owner to create uncertain future estates by forbidding owners from imposing conditions on conveyances that block the free disposition of property). However, "[r]igid application of the ancient rule against restraints on

alienation is to be avoided. Surely the courts do not seek to invalidate bona fide transactions by the imported application of esoteric legalisms. Our task is not to block the business pathway but to clear it, defining it by guideposts that are reasonably to be expected." *Carma Developers v. Marathon Dev. Cal.*, 826 P.2d 710, 716 (Cal. 1992) (quotation omitted). Thus, assessing the reasonableness of a challenged restraint involves balancing the policy of respecting the intent of contracting parties with the policy of preserving the free alienability of real property: "[A] direct relationship exists between the *justification* for enforcement of a particular restraint on the one hand, and the *quantum of restraint*, the actual practical effect upon alienation which would result from enforcement, on the other. Thus, the greater the quantum of restraint that results from enforcement of a given clause, the greater must be the justification for that enforcement." *Id.* Factors to be considered when determining whether a particular restraint is unreasonable include, "its purpose, duration and, where applicable, the designated method for fixing the purchase price." *Metropolitan Transp.*, 492 N.E.2d at 381.

In *Pope v. Lee*, 152 N.H. 296 (2005), we upheld a lease term securing for a tenant the right to continual renewal of a commercial lease as reasonable in view of the justifiable interests of the parties. *Pope*, 152 N.H. at 306-07. The lease was for a seasonal ice cream and food business, established a lease payment based on the applicable consumer price index, and included clauses governing rental increases, adjustments and taxes. *Id.* at 297-300. When assessing the reasonableness of the continual renewal right, we considered the justifiable interests at stake in light of the extent of the restraint on the alienability of the land created by the right of continual renewal clause. *Id.* at 307. Ultimately, we determined that the continual renewal term did not foreclose the landowners from selling the premises, stating: "It is not unreasonable to believe that potential buyers may desire to purchase a business that is already fully in operation and occupied by a paying tenant." *Id.*

The facts before us stand in stark contrast to *Pope*. The Haying Agreement includes no provision for the payment of any rent or property taxes. Rather, the consideration received by the landowner is the maintenance of "the access ways and roadways throughout and to the property, including snow removal from the driveway during winter months." The only other obligations placed on Winecellar are the maintenance of the fields and harvesting "in accordance with practices recommended by the UNH Cooperative Extension," and the retention of an umbrella liability insurance policy providing for $1 million in coverage. In exchange, the agree-

ment grants Winecellar a perpetual right to hay fields on property conveniently located adjacent to its farm "throughout the appropriate times of the year."

This agreement, while purporting to grant a significant benefit to the adjacent farm "in perpetuity," potentially effects a significant hindrance on the alienability of the Bedard Farm, not only to any potential purchasers not wishing to maintain the property as a farm, but even to prospective purchasers who might desire to continue using it for farming purposes but who wish to use the fields in question for cultivation of crops, pasturing of animals or other farm-related use. There is no evidence in the record to suggest, nor do we believe it reasonable to conclude, that a bona fide purchaser seeking to buy the Bedard Farm would be willing to do so in light of the existence of the Haying Agreement. Therefore, while respecting the right of a contracting land owner to restrict the use of his or her property "to any use that he or she sees fit, within the confines of the law," *id.* at 303, we conclude that Winecellar has failed to demonstrate that the trial court erred in ruling that the Haying Agreement constitutes an unreasonable restraint on the alienation of real property.

We briefly address Winecellar's argument that the heirs' conduct in probate court estops them from denying the nature of the Haying Agreement as a perpetual lease. According to Winecellar, the heirs relied on the perpetual lease as an encumbrance on the property and realized a tax benefit of over $400,000 when they failed to object to the amended inventory filed in probate court. Aside from our conclusion that the Haying Agreement constitutes an unreasonable restraint on alienation, this argument fails on its merits. The amended inventory reflects that an appraiser reduced the value of the Bedard Farm due to "the existence of *[the] claimed encumbrance* . . . [which] would allow for the perpetual harvesting of hay from the property by a neighboring farm, thereby negating the highest and best use of the property." (Emphasis added.) However, the fact that the heirs acknowledged the impact of the claimed encumbrance on the value of the property does not equate to conceding the validity of the claimed encumbrance or its perpetual nature.

V

Turning to the cross-appeal, the respondents argue that the trial court erred when it awarded Winecellar the right to purchase the buffalo pastures because it misapplied the law of part performance. We agree.

Despite its ruling that the doctrine of part performance did not apply, the trial court awarded Winecellar the right to purchase the buffalo pastures it had been leasing at a price to be determined by an independent appraiser. It ruled:

As to the second prong of the *Greene* test, pertaining to restitution, the court understands that Winecellar has invested a significant amount of money and effort that it will not be able to recoup in preparing the fields on the Bedard Farm to pasture their buffalo. Accordingly, Winecellar will be permited to purchase the buffalo pastures it has been leasing from the Bedard Farm's owners . . . .

■ As outlined earlier, the inadequacy of restitution is one of three factors considered when determining whether the doctrine of part performance withdraws an oral contract for the sale of land from operation of the statute of frauds. *See Greene*, 156 N.H. at 729 ("the remedy of restitution is not reasonably adequate, making it very unjust for the defendant to hide behind the statute" (quotation omitted)). However, the point of this factor is that if restitution is available as a reasonably adequate remedy, this weighs against allowing the oral contract to be specifically enforced because, in that circumstance, the award of a monetary recovery provides adequate relief. Winecellar has not cited, nor are we aware of, any authority supporting the award of a land transfer based on the inadequacy of restitution where the trial court has rejected the applicability of the part performance doctrine. Accordingly, we reverse this award of a purchase right and remand to the trial court to consider what, if any, monetary relief Winecellar may be entitled to recover.

## VI

One final issue remains. The respondents argue that the trial court erred by not ordering Winecellar to pay them the lease payments for its use of the buffalo pastures during the pendency of the litigation. They contend that the $400 monthly payments under the Pasture Agreement "were held by [Winecellar's] counsel pending a determination of the outstanding claims," and that "the payments should rightfully be turned over to the [respondents] as the owners of the property [Winecellar] has been occupying under the buffalo land lease." Winecellar contends that the respondents rejected the lease payments it sent to them after Eva Bedard's death, that there was no agreement between the parties for counsel to hold the funds, and that the respondents' claim for such lease payments was never raised prior to the merits hearing. On the record presented to us, we conclude that this issue is not ripe for appellate review.

■ First, the parties dispute whether they agreed that Winecellar's counsel would hold the funds pending a final resolution of the case, and the record does not permit resolution of the dispute. Additionally, there is no indication that the lease payment issue was presented to the trial court

prior to or during the merits hearing. Although the respondents requested the payments in a pleading filed after the merits hearing, the trial court's decision was silent on the matter. Some of the respondents raised the issue again in a limited motion for reconsideration, but we were not provided with the trial court's ruling on that motion. Under these circumstances, we leave the issue for the trial court's consideration on remand following such further proceedings as the trial court may deem necessary.

*Affirmed in part; reversed in part; remanded.*

DALIANIS, C.J., and DUGGAN, HICKS and CONBOY, JJ., concurred.