[No. B222284. Second Dist., Div. Eight. Apr. 30, 2012.]

ESTHER GINSBERG, Plaintiff, Cross-defendant and Appellant;
v.
HANNA GAMSON, Defendant, Cross-complainant and Appellant;
HARRY EDEN, Cross-defendant and Appellant.

COUNSEL

Epstein Turner Weiss and Michael R. Weiss for Plaintiff, Cross-defendant and Appellant and for Cross-defendant and Appellant.

Claremont Law Group, Luisa G. Jaffe, Saul Jaffe; Greines, Martin, Stein & Richland, Robin Meadow and Lara M. Krieger for Defendant, Cross-complainant and Appellant.

## OPINION

**BIGELOW, P. J.**—This case concerns a dispute over a commercial lease and the landlord's performance under that lease. The parties disagreed on whether the tenant has the right to unlimited extensions of the lease. The trial court concluded the lease grants the tenant the right to unlimited five-year extensions for 99 years. A jury subsequently concluded the landlord breached the lease. In addition to compensatory damages, the jury awarded the tenant over $300,000 in punitive damages, based on a claim for "intentional interference with premises." The trial court issued an injunction ordering the landlord to comply with certain repair obligations under the lease. However, the court struck the punitive damages award.

On appeal, the landlord, Hanna Gamson, contends (1) the trial court erred in concluding the lease gives the tenants, Esther Ginsberg and Harry Eden, the right to unlimited extensions of the lease and (2) the trial court abused its discretion in issuing an injunction that exceeds the parties' rights and responsibilities under the lease. Ginsberg and Eden cross-appeal to challenge the trial court's order striking the punitive damages award. We reverse the trial court's ruling on the interpretation of the option to extend the lease. We conclude the lease cannot be construed as allowing unlimited extensions, and instead it afforded Ginsberg the right to only one extension period. We affirm the trial court's order striking punitive damages.

## FACTUAL AND PROCEDURAL BACKGROUND

The evidence adduced at trial was as follows. In April 1996, Ginsberg entered into a commercial lease with Isaac and Ingeborg Rubinfeld for a retail space at 134–136 South La Brea Avenue in Los Angeles. The term of the lease was five years. The lease appeared to give Ginsberg the option to extend the lease for five additional five-year periods.[1] Soon after signing the lease, Isaac Rubinfeld died, and Ingeborg Rubinfeld was unable to handle their business affairs. Their daughter, Gamson, became Ingeborg Rubinfeld's conservator. In her capacity as conservator, Gamson signed a new lease with Ginsberg and Eden. The new lease was also for a five-year term from April 15, 1996, to April 14, 2001. The tenant was to use the premises for "a retail store selling textiles, clothing, accessories, light furnishings and other similar items and for no other purpose without the Landlord's prior written consent." The landlord was to maintain the foundations, exterior walls, exterior roof, unexposed electrical, plumbing and sewage systems, window frames, gutters

---

[1] The lease stated: "Provided that Tenant shall not then be in default hereunder, Tenant shall have the option to extend the Term of this Lease for 5 (FIVE) YEARS [*sic*] additional FIVE year periods upon the same terms and conditions herein contained . . . ."

and downspouts, sidewalks, landscaping, the parking lot adjacent to the property, and other premises improvements. The landlord was also to pay all real property taxes and general assessments levied against the premises.

The lease included a separately typed addendum which contained a provision entitled "Option to Extend Term," stating:

"Provided tenant is not in default under the lease, Tenant shall have the option to extend the term of the lease for additional five year periods upon the same terms and conditions contained in the lease except as hereafter stated. Tenant shall exercise this option to extend the term of the lease by serving on Landlord the Tenant's written notice of Tenant's exercise of the option to extend not less than ninety (90) days prior to the expiration of each term. The rent payable during each option term shall be increased in direct proportion to changes in the Consumer Price Index as hereafter defined. The adjustments shall be determined by the following formula:

$$\text{Option Rent} = \frac{\text{Consumer Price Index for March, 1996}}{\text{Consumer Price Index for March, 2001}} \times \$3,000.00 \text{ (etc.)}$$

"The term 'Consumer Price Index' means the Consumer Price Index, U.S. Department of Labor, Bureau of Labor Statistics, All Urban Consumers, (1982–84 base year) for the Los Angeles-Long Beach-Anaheim, California area, all items. In the event the index referred to above ceases to be published or any revised or substituted index ceases to be comparable to the index defined above, then the most reasonably comparable figures available shall be substituted in determining the changes to the rent. In no event shall the rent adjustment for the next extended term exceed 10% of the rent during the expiring term of the Lease."

The addendum also included provisions regarding building repairs the tenant agreed to fund, with corresponding reductions in the monthly rent; a provision entitling the landlord to demand a tenant contribution to real property taxes should the premises be sold "during the term of the Lease or any extended term thereof"; and a tenant right of first refusal should the landlord wish to sell the leased premises "during the term of the Lease or any extended term thereof."

The parties signed the lease and addendum in or around July 1996. In March 2001, Ginsberg extended the lease for an additional five years, in accordance with the lease and addendum, and the parties agreed to an increase in rent from $3,000 to $3,300 per month. Ginsberg operated a vintage clothing store from the leased premises. In November 2004, Ginsberg sent Gamson a letter in which she purported to give notice that she would exercise her "second of five" options to extend the lease.

However, beginning in late 2003, there were problems with the leased premises, such as rainwater and wastewater leaking into the store, an indentation in the floor, peeling paint, and cockroaches. Ginsberg demanded that Gamson make repairs, or that Ginsberg be allowed to make repairs. According to Ginsberg, the repairs Gamson made were insufficient. Further, although Gamson gave Ginsberg a key to the residential units above the store, at some point the locks were changed and Ginsberg did not receive a new key. This made it impossible for her to address the water intrusion problems in her store. Gamson and her agents also made comments about renegotiating the lease, or suggested it was necessary for Ginsberg to sign a new lease.

In February 2006, Ginsberg filed suit against Gamson for breach of contract, intentional interference with use of premises, intentional infliction of emotional distress, fraud, conversion, and injunctive relief. In a subsequent amended complaint, Ginsberg added a claim for trespass to chattel. Ginsberg alleged Gamson had engaged in a scheme to improperly terminate the lease so as to procure higher rent. Ginsberg alleged that in furtherance of this scheme, Gamson failed to repair or allow Ginsberg to repair plumbing leaks that caused damage to her store and merchandise; refused to repair hazardous floor problems that caused the store to look unsightly; refused to provide Ginsberg with access to a phone terminal; unreasonably withheld consent for Ginsberg to sublease a portion of the store; and repeatedly demanded Ginsberg agree to a new lease. In January 2007, Gamson filed a cross-complaint. After a number of amendments, the cross-complaint sought only declaratory relief in the form of a determination that the lease gave Ginsberg and Eden the right to extend the lease only once, rather than perpetually. The cross-complaint also sought a judicial declaration that Ginsberg and Eden (collectively Ginsberg) were holdover tenants in a month-to-month tenancy because the one permitted extended period had expired.

In 2008, both sides sought summary judgment of Gamson's cross-complaint. Gamson contended the undisputed facts established the lease provided only one option for a single five-year extension of the lease. Ginsberg contended the language of the lease clearly provided for "a series" of renewals under the lease, limited by statute to 99 years. Ginsberg also asserted the statute of limitations barred Gamson's claims for declaratory relief. The trial court denied both motions. The court found neither party established there was no disputed fact concerning the meaning of the lease addendum's "[o]ption to [e]xtend [t]erm" provision. The court concluded that "at best . . . there is ambiguity as to whether an option or options were granted to the tenant."

In August 2009, Gamson moved to bifurcate the trial. The trial court denied the motion, but indicated it would start the trial with a bench

proceeding in which it would decide whether the lease was ambiguous. The court then determined the lease was not ambiguous and provided Ginsberg a "series of options of five years," limited to 99 years by Civil Code section 718.[2] Following a jury trial of Ginsberg's claims for breach of written and oral contract, "intentional interference with use of premises," and trespass to chattel, the jury returned a special verdict in Ginsberg's favor on the breach of contract and intentional interference claims. The jury awarded Ginsberg $49,100 in compensatory damages and $385,000 in punitive damages.

Ginsberg requested injunctive relief. The trial court issued an injunction ordering Gamson to make repairs to the leased premises within 48 hours of notice of the need for repairs. If Gamson did not make repairs within 48 hours, she was ordered to immediately provide Ginsberg access to the building to make repairs. The injunction further ordered Gamson to give Ginsberg working and updated keys to an apartment security gate and hallway in accordance with the terms of the lease, and access to the premises' telephone connections.

Gamson filed motions for new trial and judgment notwithstanding the verdict, both of which challenged the jury's punitive damages award. The trial court granted the motions and struck the punitive damages award. The court noted that all of Gamson's challenged conduct was "within the contract," and the jury's finding of malice, oppression and fraud on the breach of covenant of quiet enjoyment was "part of the contract claim."

The instant appeals followed. Gamson challenges the trial court's ruling on her declaratory relief claims and the injunctive relief awarded on Ginsberg's claims. Ginsberg challenges the trial court order striking the punitive damages award.[3]

## DISCUSSION

### Gamson's Appeal

I. *The Lease Did Not Unequivocally Provide for Unlimited Extensions*

Gamson contends the trial court erred in concluding the lease clearly provided for unlimited extensions, limited only by Civil Code section 718. " '[W]e apply de novo review, exercising our independent judgment as to the

---

[2] Civil Code section 718 states, in relevant part: "No lease or grant of any town or city lot, which reserves any rent or service of any kind, and which provides for a leasing or granting period in excess of 99 years, shall be valid."

[3] Neither side challenges the portion of the judgment entering the jury's verdict on liability or the compensatory damage award.

meaning of . . .' [a lease] because '[i]t is a judicial function to interpret a contract or written document unless the interpretation turns upon the credibility of extrinsic evidence. . . . We are guided by the well-settled rules of interpretation of a contract, endeavoring to effectuate the mutual intent of the parties as it existed at the time of contracting insofar as it is ascertainable and lawful.' [Citation.]" (*Quantification Settlement Agreement Cases* (2011) 201 Cal.App.4th 758, 797–798 [134 Cal.Rptr.3d 274]; see *Eltinge & Graziadio Dev. Co. v. Childs* (1975) 49 Cal.App.3d 294, 297–298 [122 Cal.Rptr. 369].) We conclude the lease cannot be construed as awarding Ginsberg unlimited extensions.

### A. The Statute of Limitations Does Not Bar Gamson's Declaratory Relief Claims

■ As an initial matter, we disagree with Ginsberg's contention that the statute of limitations barred Gamson's claims for declaratory relief. This is a question of law subject to our de novo review. (*Sahadi v. Scheaffer* (2007) 155 Cal.App.4th 704, 713–714 [66 Cal.Rptr.3d 517].) The limitations period for declaratory relief claims depends on "the right or obligation sought to be enforced," and the statute of limitations "generally follows its application to actions for damages or injunction on the same rights and obligations." (*Howard Jarvis Taxpayers Assn. v. City of La Habra* (2001) 25 Cal.4th 809, 821 [107 Cal.Rptr.2d 369, 23 P.3d 601].) ■ Gamson's cross-complaint concerned obligations or liabilities "founded upon an instrument in writing." (Code Civ. Proc., § 337, subd. 1.) A four-year statute of limitations applied. (*Ibid.*)

■ The parties agree that the lease afforded Ginsberg at least one extension, which extended the lease until April 2006. Even if Gamson realized the parties had different interpretations of the lease's option to extend, there would have been no breach of the lease, either on Ginsberg's part by being a holdover tenant, or on Gamson's part by insisting the lease had terminated, until after April 2006. The limitations period did not begin to run until a breach occurred. (*Romano v. Rockwell Internat., Inc.* (1996) 14 Cal.4th 479, 489 [59 Cal.Rptr.2d 20, 926 P.2d 1114]; *Garver v. Brace* (1996) 47 Cal.App.4th 995, 999–1000 [55 Cal.Rptr.2d 220] (*Garver*) [limitations period does not begin to run until the plaintiff sustains actual and appreciable harm].) A party may seek declaratory relief before there has been an actual breach of an obligation; in such cases the limitations period still does not begin to run until the breach occurs. (*Maguire v. Hibernia S. & L. Soc.* (1944) 23 Cal.2d 719, 734 [146 P.2d 673].) The parties agree that the effective filing date of the cross-complaint was February 2006. This was well within the limitations period. We reject Ginsberg's argument that the limitations period began to run in 1996 when the parties signed the lease. (*Garver, supra*, at p. 1001.)

B. *Special Rule of Construction Relating to Perpetual or Unlimited Renewals*

■ In general, lease provisions giving the tenant the right to perpetual renewals are disfavored.[4] In *Morrison v. Rossignol* (1855) 5 Cal. 64, 65 *(Morrison)*, the California Supreme Court concluded a covenant allowing a lease to be renewed indefinitely at the lessee's option is "in effect, the creation of a perpetuity; it puts it in the power of one party to renew forever, and is therefore against the policy of the law." Although subsequent cases have determined that a perpetual renewal provision does not violate the rule against perpetuities *(Shaver v. Clanton* (1994) 26 Cal.App.4th 568, 575–576 [31 Cal.Rptr.2d 595] *(Shaver))*, *Morrison* still reflects the law's general skepticism about such provisions. (See generally Annot., Sufficiency of Provision of Lease to Effect Second or Perpetual Right of Renewal (1984) 29 A.L.R.4th 172, 177, 179, §§ 3, 4; *Blackmore v. Boardman* (1859) 28 Mo. 420 [because the law discourages perpetuities, it does not favor covenants for continued renewals]; *Hallock v. Kintzler* (1943) 142 Ohio St. 287 [51 N.E.2d 905, 906] *(Hallock)* [courts do not favor perpetuities, and law does not favor perpetual leases]; *Burns v. City of New York* (1915) 213 N.Y. 516 [108 N.E. 77, 79] [citing English and American authorities].) In other legal contexts as well, California courts have noted that contract provisions creating perpetual rights are disfavored. (See *Cooper Companies v. Transcontinental Ins. Co.* (1995) 31 Cal.App.4th 1094, 1103 [37 Cal.Rptr.2d 508] [insurance policy]; *Nissen v. Stovall-Wilcoxson Co.* (1953) 120 Cal.App.2d 316, 319 [261 P.2d 10] *(Nissen)* [agreement to pay assessments on land]; *O. T. Johnson Corp. v. Pacific E. R. Co.* (1937) 19 Cal.App.2d 306, 311 [65 P.2d 368] [use of land for narrow purpose].)

Despite being disfavored, courts will enforce a lease provision that grants a tenant the right to unlimited renewals, so long as the parties' intent to create that right is explicit and clear. In *Becker v. Submarine Oil Co.* (1921) 55 Cal.App. 698 [204 P. 245] *(Becker)*, the Court of Appeal stated the general rule: "It is true that while not within the purview of the rule against

[4] We refer to extensions and renewals interchangeably. Although there technically is a difference between a renewal of a lease and an extension of a lease, as noted in Witkin, the distinction is "not always observed. Exercise of an option to renew, for example, is regarded simply as an extension of the original lease for an additional term." (12 Witkin, Summary of Cal. Law (10th ed. 2005) Real Property, § 527, p. 606.) We also note that the lease extension provision at issue in this case could not be truly "perpetual," since Civil Code section 718 limits leases of town or city lots to 99 years. This does not change our analysis. The issue is the same as in a case concerning a renewal provision that will not be cut short by operation of statute. In both situations, the court must determine whether the provision sufficiently sets forth an intent to give the lessee an open-ended right to renew into an extremely long-term and undefined future. Further, Ginsberg's position is that the lease granted her unlimited renewals and Civil Code section 718 independently imposes a 99-year limit. We find the jurisprudence regarding "perpetual renewal" provisions equally applicable to the option to extend before us.

perpetuities, leases which may have been intended to be renewable in perpetuity, if at all uncertain in that regard, will be construed as importing but one renewal. This principle is announced in *Diffenderfer* v. *Board, etc.* [(1894)] 120 Mo. 447 [25 S.W. 542], and *Syms* v. *Mayor of New York* [(1887)] 105 N.Y. 153 [6 N.Y. St. 830, 11 N.E. 369] . . . . [¶] On the other hand, a clause providing for perpetual renewals at the option of the lessee is held to be enforceable when it appears that it was clearly the intention of the parties that the lessee should have that right. (*Burns* v. *City of New York*, [*supra*, 108 N.E. 77]; *Blackmore* v. *Boardman*, [*supra*,] 28 Mo. 420.) This provision is also clearly stated in *Diffenderfer* . . . ." (*Id.* at p. 700; see *Nissen, supra*, 120 Cal.App.2d at p. 319 [contract will be construed to impose an obligation in perpetuity only when the language unequivocally compels such a construction].)

■ The *Becker* court thus adopted what is essentially a special rule of construction applied to a lease provision that appears to give the tenant the right to perpetual renewals of the lease. As the United States Supreme Court explained in *Winslow* v. *Baltimore & Ohio Railroad* (1903) 188 U.S. 646, 655 [47 L.Ed. 635, 23 S.Ct. 443] (*Winslow*): "From the ordinary covenant to renew, a perpetuity will not be regarded as created. There must be some peculiar and plain language before it will be assumed that the parties intended to create it." And, as stated in *Diffenderfer*, upon which the *Becker* court relied: "Unless it appears from the covenant in the lease, by express term or clearly by implication, that plaintiffs are entitled to have the lease renewed for all time to come, a court of equity will not decree specific performance of the covenant for that purpose. . . . So it has been said that a covenant which does not plainly imply or express a perpetual renewal, will not be construed to give this right." (*Diffenderfer* v. *Board, etc., supra*, 25 S.W. at p. 544, citations omitted; see *Hallock, supra*, 51 N.E.2d at p. 906.) When confronted with a lease that is equivocal or ambiguous as to whether the tenant has a right to unlimited renewals of the lease, courts following this rule do not apply principles of contract interpretation that would allow admission of extrinsic evidence relevant to the parties' intent, or rules construing ambiguities against the drafter. Instead, courts simply will not construe the provision as creating a right to perpetual renewals. (See *Geyer* v. *Lietzan* (1952) 230 Ind. 404 [103 N.E.2d 199, 200] (*Geyer*) ["A lease will, if possible, be so construed as to avoid a perpetuity by renewal."]; *Oak Bay Properties v. Silverdale Sportsman's Center* (1982) 32 Wn.App. 516 [648 P.2d 465, 466] (*Oak Bay*) [when there is a contention that lease is perpetually renewable, the usual principles of contract interpretation "do not apply in the usual way"].)

The second part of the rule is that a "general" covenant to renew is construed as providing only one renewal. The *Winslow* court explained: "It is quite plain that a lease containing a covenant to renew at its expiration with similar covenants, terms and conditions contained in the original lease is fully

carried out by one renewal without the insertion of another covenant to renew." (*Winslow, supra,* 188 U.S. at p. 654.) This portion of the rule is also repeated in *Becker,* in which the court explained that "leases which may have been intended to be renewable in perpetuity, if at all uncertain in that regard, will be construed as importing but one renewal." (*Becker, supra,* 55 Cal.App. at p. 700.)

## C. *California Cases Addressing Perpetual or Unlimited Renewals*

■ Although a few California courts after *Becker* have considered leases containing perpetual renewal provisions, none of the resulting cases include a detailed analysis of whether the lease in question clearly established the parties' intent to create a right to perpetual renewals. For example, in *Penilla v. Gerstenkorn* (1927) 86 Cal.App. 668, 669 [261 P. 488] (*Penilla*) the court considered a lease provision that gave the lessees " 'the right of renewing this lease' " at the end of an initial four-year term. At the end of the four-year term, the lessors refused to acknowledge the lessee had a right to renew the lease. The Court of Appeal concluded that although the renewal provision was "general, it is sufficiently certain to be enforceable. It does not, as [lessors] contend, purport to create a perpetuity . . . . 'A general covenant to extend or renew implies an additional term equal to the first, and upon the same terms, including that of rent, except the covenant to renew; to include which would make the lease perpetual.' [Citation.]" (*Id.* at p. 670.) The court thus applied the special rule of construction to a very general renewal provision. It declined to interpret general renewal language as creating a right to unlimited renewals. Instead, the court found the tenant had the right to only one renewal period.

*Epstein v. Zahloute* (1950) 99 Cal.App.2d 738 [222 P.2d 318], concerned a lease that granted the tenant the " 'option for renewal each succeeding year thereafter . . . .' " The court found the lease created an invalid perpetuity, relying on *Morrison,* and distinguishing *Becker* on the ground that it concerned an oil and gas lease. (*Epstein,* at p. 739.) The *Epstein* court also concluded the renewal provision was invalid because it violated Civil Code section 718. (*Epstein,* at p. 739.) Two later cases rejected the *Epstein* court's reasoning. One of the cases, *Fisher v. Parsons* (1963) 213 Cal.App.2d 829 [29 Cal.Rptr. 210], did not concern a perpetual renewal provision. However, *Shaver, supra,* 26 Cal.App.4th 568, rejected *Epstein* in the context of a perpetual renewal provision.

The *Shaver* decision does not restate the language of the lease provision at issue in that case. Instead, the court reported only that an amendment to the parties' lease "granted the [tenants] options to extend the lease for additional five-year periods beginning at the end of each prior lease period and gave

them a right of first refusal if the property were offered for sale." (*Shaver, supra*, 26 Cal.App.4th at pp. 571–572.) The trial court concluded the amendment was invalid because it " 'attempted to provide for option renewals into infinity.' " (*Id.* at p. 572.) The Court of Appeal rejected the trial court's conclusion, but did not address whether the language of the lease clearly demonstrated the parties' intent to create a right to unlimited extensions. There is no mention of a dispute on that issue in the case.[5] Instead, the *Shaver* court held a perpetual renewal provision does not violate the rule against perpetuities, and is not invalid under Civil Code section 718, except for any period beyond 99 years. (*Shaver*, at pp. 575–576.)

### D. Other Jurisdictions' Application of the Special Rule of Construction

The parties have not identified any other California cases addressing perpetual or unlimited renewal provisions in a lease, and our research has disclosed no others.[6] However, many courts in other jurisdictions have interpreted lease provisions purporting to create perpetual renewals. Most have taken a restrictive approach, in line with the *Winslow* court's requirement of "peculiar and plain language." (*Winslow, supra*, 188 U.S. at p. 655.) For example, numerous courts have concluded that renewal provisions stating the lease may be renewed from "year to year," or for "successive" periods or terms, do not clearly or unambiguously indicate an intent to provide perpetual renewals. (See, e.g., *Bancard Services, Inc. v. E\*Trade Access, Inc.* (D.Or. 2003) 292 F.Supp.2d 1235, 1246, 1251 (*Bancard Services*) [applying Or. law; option to renew " 'for additional periods of five (5) years each' "]; *McLean v. U.S.* (E.D.Va. 1970) 316 F.Supp. 827, 828, 831 (*McLean*) [option to renew from year to year]; *Waldrop v. Siebert* (1970) 286 Ala. 106 [237 So.2d 493, 495–496] (*Waldrop*) [option to renew for an additional term, and year to year thereafter]; *Lonergan v. Connecticut Food Store, Inc.* (1975) 168 Conn. 122 [357 A.2d 910, 912, 915] (*Lonergan*) [lease automatically extended " 'for a period of one year and thence from year to year' "]; *Geyer, supra*, 103 N.E.2d at pp. 201–202 [option to renew "successively"]; *Burke v. Permian Ford-Lincoln-Mercury* (1981) 95 N.M. 314 [621 P.2d 1119, 1120–1121]

---

[5] The lease at issue in *Shaver* was originally for a 10-year term, with one option to renew for another 10 years. (*Shaver, supra*, 26 Cal.App.4th at p. 571.) During the second 10-year term, the lessor executed an amendment to the lease which added an option to renew for two additional five-year periods, but the amendment was rescinded. The parties subsequently executed an amendment granting the lessees "options to extend the lease for additional five-year periods beginning at the end of each prior lease period and gave them a right of first refusal if the property were offered for sale." (*Id.* at pp. 571–572.)

[6] A concurring justice's opinion in *Shaver* offers an explanation for the absence of such cases: "[O]pen-ended leases and options in perpetuity must be about as common as polar bear sightings in Death Valley. The Court of Appeal is not likely to see another such case in the next 99 years." (*Shaver, supra*, 26 Cal.App.4th at p. 578 (conc. opn. of Crosby, J.).)

(*Burke*) [right to renew for " 'successive like terms' "]; *Lattimore v. Fisher's Food Shoppe, Inc.* (1985) 313 N.C. 467 [329 S.E.2d 346, 347] (*Lattimore*) [lease automatically renewed for successive five-year terms]; *Hallock, supra,* 51 N.E.2d at pp. 905–906 [option to renew from year to year]; *Gray v. Stadler* (1938) 228 Wis. 596 [280 N.W. 675, 676] (*Gray*) [option of " 'extension in periods of fifteen years' "]; *Pults v. City of Springdale* (1988) 23 Ark.App. 182 [745 S.W.2d 144, 146–147] (*Pults*) [option to renew for successive terms]; *Carder, Inc. v. Cash* (Colo.Ct.App. 2003) 97 P.3d 174, 180, 182 (*Carder*) [option to renew for successive periods of five years each]; *Schroeder v. Johnson* (Fla.Dist.Ct.App. 1997) 696 So.2d 498, 499 (*Schroeder*) [right to extend for successive five-year periods]; *Oak Bay, supra,* 648 P.2d at pp. 467–468 [right to renew annually].)

Several courts have reasoned that an unequivocal perpetual renewal provision would include terms such as "forever," "in perpetuity," or "for all time." (*Lonergan, supra,* 357 A.2d at p. 914; *Geyer, supra,* 103 N.E.2d at p. 201; *Bancard Services, supra,* 292 F.Supp.2d at p. 1250; *Rutland Amusement Co. v. Seward* (1968) 127 Vt. 324 [248 A.2d 731, 734] (*Rutland*); *Tischner v. Rutledge* (1904) 35 Wn. 285 [77 P. 388, 389] (*Tischner*); *Farone v. Mintzer* (N.Y.App.Div. 1987) 133 A.D.2d 1009 [521 N.Y.S.2d 158, 160] (*Farone*).) The North Carolina Supreme Court adopted a "brightline" rule that "[u]nless a lease agreement contains the terms 'forever,' 'for all time,' 'in perpetuity' or words *unmistakably* of the same import, no perpetual lease or right to perpetual renewals may be found to have been created." (*Lattimore, supra,* 329 S.E.2d at p. 350.)

Some courts have also searched the lease as a whole for indicia that the parties intended to grant the lessee unlimited renewals. For example, in *Lonergan,* the Connecticut Supreme Court noted the absence of a rent escalation clause, the lessor's agreement to repair demised buildings and repair and restore them in the event of partial or total destruction, and the lessor's agreement to pay all taxes, assessments, and charges, including those related to water use, all suggested the parties did not intend to create a right to perpetual renewals. (*Lonergan, supra,* 357 A.2d at p. 914.) In *Geyer,* the Indiana Supreme Court noted a provision requiring the lessee to return the property in the same condition as when it was leased was inconsistent with the idea that the parties envisioned a lease that might last several centuries. The court further noted restrictions on the use of the property for one specific purpose (general merchandising), and the inclusion of the lessee's heirs, assigns, or other similar terms in the main body of the lease, but not in the renewal clause, cast doubt on whether the parties intended to create a right to perpetual renewals. (*Geyer, supra,* 103 N.E.2d at pp. 201–202; see *McLean, supra,* 316 F.Supp. at pp. 828–829, 832; *Rutland, supra,* 248 A.2d at p. 734; *Tischner, supra,* 77 P. at p. 389; *Oak Bay, supra,* 648 P.2d at pp. 467–468.)

E. *The Option to Extend Here Does Not Unequivocally Establish an Intent to Create a Right to Unlimited Extensions*

To interpret the provision at issue here, we first turn to *Becker*, which adopted the special rule of construction. In *Becker*, the renewal provision stated: " 'To have and to hold the same period unto the party of the second part, his heirs and assigns for the term and period of ten years from date hereof with the right of renewal for a further term of ten years at the end of such term, or at the end of any subsequent term for which it may be renewed.' " (*Becker, supra,* 55 Cal.App. at p. 699.) The *Becker* court concluded this language was "so plain that no room is left for construction. The parties have made it clear that it was their intention that the lessee should have the right of renewal in perpetuity." (*Id.* at p. 700.) Presumably, the most clear language was "or at the end of any subsequent term for which it may be renewed." This phrase indicated the right to renew would be included in each renewed lease, without limit. (See *In re Mackie's Petition* (1963) 372 Mich. 104 [125 N.W.2d 482, 485] [right to perpetual renewals created by language stating renewal provision would be operative in each and every renewal lease].) In addition, the provision specifically referenced the lessee's heirs and assigns, suggesting the possibility of a long-term arrangement that would outlast the original lessee.

In contrast, here the language of the extension option does not clearly or unequivocally establish that the parties intended to give the tenant unlimited extensions. The addendum's "[o]ption to [e]xtend [t]erm" does not state the tenant would have the option to extend the term for additional five-year periods in perpetuity, forever, or for all time, except as limited by statute. While the *Becker* lease referenced a right of renewal "at the end of any subsequent term," the option here more ambiguously references "additional five year periods," requires notice "prior to the expiration of each term," and in other provisions, mentions "any extended term" of the lease. This language is less definite than that of the *Becker* lease, which indicated the renewal covenant would be included in any renewed lease. Although the option here contains a rent escalation clause, it is not clear that the formula would apply to periods beyond one extension. The formula is, on its literal terms, based on the ratio of the Consumer Price Indexes for March 1996 and March 2001, and the initial rent amount of $3,000. Although the word "etc." is included in parentheses after the formula, this does not clearly indicate that the formula was to be modified to include Consumer Price Indexes for future years. (Cf. *Shaver, supra,* 26 Cal.App.4th at p. 575 [rent escalation provision tied monthly rental for each new five-year period to " 'the smallest value of the Cost of Living Indexes . . . as measured over the prior five (5) year period' "].) The rent escalation clause is not an unambiguous indication that the lease was intended to perpetually renew at the lessee's option. (See *Oak*

*Bay, supra*, 648 P.2d at p. 468 [rent escalation clause alone does not indicate parties intended a perpetual lease].)

Similarly, the option references rent during "each option term." But the provision's cap on rent increases states: "In no event shall the rent adjustment for the next extended term exceed 10% of the rent during the expiring term of the Lease." This also fails to unequivocally establish that the lease was intended to continue perpetually at the tenant's option; the provision could refer to a single extension or to multiple extensions. (*Geyer, supra*, 103 N.E.2d at p. 201 [rent escalation clause construed to allow only one increase would be an unreasonable provision in a perpetual lease].)

Moreover, the lease as a whole fails to demonstrate a clear intent to create a right to unlimited extensions. It contains numerous provisions more consistent with a short-term lease than a perpetual, decades-long leasehold. For example, the tenant is restricted to using the premises for one specific retail purpose unless the landlord consents to other uses. (*Geyer, supra*, 103 N.E.2d at p. 201; *Rutland, supra*, 248 A.2d at p. 734; *Cook v. Adams County Plan Com.* (Ind.Ct.App. 2007) 871 N.E.2d 1003, 1008 (*Cook*); *Oak Bay, supra*, 648 P.2d at p. 467.) The lease requires the landlord to maintain significant responsibility for the leased property, including the obligation to make repairs, pay property taxes, and pay for water and rubbish services. (*Geyer, supra*, at p. 201; *Lonergan, supra*, 357 A.2d at p. 914 [landlord's obligations, including water costs, and absence of rent escalation to cover such costs]; *Rutland, supra*, at p. 734 [taxes]; *Oak Bay, supra*, at p. 467.) The lease forbids the tenant from making any alterations over $1,000 without the landlord's consent, and requires that the property be returned in "good condition," excepting ordinary wear and tear. (See *Geyer, supra*, at p. 201; *Rutland, supra*, at p. 734; *Tischner, supra*, 77 P. at p. 389; *Oak Bay, supra*, at p. 467.) We also note that the parties used a preprinted "form" lease. Although the main body of the lease includes a provision stating the lease would be binding on the parties' heirs, successors, and assigns, the extension option in the separately drafted addendum does not repeat this language. (*Geyer, supra*, at pp. 201–202.) The lease also prohibits the tenant from assigning the lease or subletting without the landlord's consent. (*McLean, supra*, 316 F.Supp. at pp. 828–829.)

Further, nothing in other provisions of the lease suggests the parties intended the tenant to have the right to unlimited extensions.[7] (See *McLean, supra*, 316 F.Supp. at pp. 828–829 [lease not under seal, lessee's right to

---

[7] Ginsberg argues the addendum provision memorializing an agreement that she would pay for certain building repairs suggests she was making significant improvements to the leased premises, and unlimited renewals would be consistent with Ginsberg's desire to protect her investment in the property. However, the repair provision explained that Ginsberg would be

remove fixtures]; *Oak Bay, supra,* 648 P.2d at p. 467 [provision giving lessor option to rebuild if premises are destroyed].) One would expect that if the parties intended the lease to potentially continue for multiple decades, they would have minimized the landlord's responsibility for the premises, allowed the tenant greater flexibility in modifying the property or transferring the lease, or ensured that the landlord had the ability to negotiate with the tenant to cover an increase in costs over time, among other things. (See, e.g., *Lonergan, supra,* 357 A.2d at p. 914.) Of course, parties are free to make bargains that are ill advised and they will be bound by the contracts they negotiate and enter. But the absence of evidence of such "long-term" planning in the lease casts further doubt on the perpetual quality of an extension provision that, on its face, does not clearly and unequivocally provide for unlimited extensions.

Several courts in other jurisdictions have reviewed provisions granting the tenant the right to "successive" renewals, and have concluded the language did not unequivocally establish the intent to create a right to perpetual renewals. (*Geyer, supra,* 103 N.E.2d at pp. 201–202; *Burke, supra,* 621 P.2d at pp. 1120–1121; *Lattimore, supra,* 329 S.E.2d at p. 347; *Pults, supra,* 745 S.W.2d at pp. 146–147; *Carder, supra,* 97 P.3d at pp. 180, 182; *Schroeder, supra,* 696 So.2d at pp. 498–499.) Here, the lease states the tenant has the option to extend the lease for "additional" five-year periods, which is even less suggestive of perpetual or unlimited renewals than the term "successive" periods. Indeed, some courts have concluded language regarding "additional periods" does not clearly show an intent to create unlimited renewals. (See *Bancard Services, supra,* 292 F.Supp.2d at pp. 1246, 1251 [option to renew " 'for additional periods of five (5) years each' " did not create right to perpetual renewals]; *Chessmasters, Inc. v. Chamoun* (Fla.Dist.Ct.App. 2007) 948 So.2d 985, 986 (*Chessmasters*) [option to extend for an additional five-year period then mentioning " 'each extended Five-Year period' "]; *Gray, supra,* 280 N.W. at p. 677 [use of plural "renewals" and "periods" not sufficient to indicate the parties intended to create a perpetual right].)

As Ginsberg points out, not all courts have so restrictively construed renewal provisions. In *Pechenik v. Baltimore and Ohio Railroad Co.* (1974) 157 W.Va. 895 [205 S.E.2d 813] (*Pechenik*), the West Virginia Supreme Court of Appeals considered a lease that gave the lessee an option to renew for "successive periods of twenty years." (*Id.,* 205 S.E.2d at p. 814.) The lessee had already renewed the lease three times. The lessors contended the lease should not be construed as creating a right to perpetual renewals. (*Ibid.*) The court noted the lessors relied on cases outside of West Virginia in which

---

reimbursed for advancing funds for the repairs through deductions in her rent payments. As such, the provision does not evidence a mutual expectation of unlimited extensions of the lease.

the courts "avoided perpetual leases only through a strained interpretation of the language in the leasehold instruments." (*Ibid.*) The court specifically rejected the Indiana Supreme Court's reasoning in *Geyer* that the term "successive" did not indicate perpetual renewals.[8] However, several factors distinguish *Pechenik* from this case. The *Pechenik* court explained: "It is clear from the language of the lease in the case at bar that the intent of the parties was to provide for an option on the part of the lessee to renew for successive twenty-year periods upon the same terms as the original lease. This interpretation is given added strength by the use of the phrase 'the party of the second part or its assigns' which contemplates successors in interest and a long term arrangement. Another clause in the lease not previously quoted contains the phrase, 'or any and all renewals thereof' which contemplates more than one renewal and gives further evidence of the intent of the parties to create a perpetual lease at the option of the lessee." (*Pechenik, supra,* 205 S.E.2d at p. 815.)

And, as noted above, the parties had already renewed the lease for three additional 20-year terms, beginning in 1931. (*Pechenik, supra,* 205 S.E.2d at p. 814.) In contrast, here, the extension option referred only to the "tenant," rather than the tenant and any successors in interest. The lease's original term was only five years, which is less indicative of a long-term arrangement than the 20-year term in the *Pechenik* lease. Further, the parties in this case had not repeatedly renewed the lease by the time the dispute arose.

In *Pope v. Lee* (2005) 152 N.H. 296 [879 A.2d 735] (*Pope*), the New Hampshire Supreme Court analyzed a lease that contained a provision for automatic renewals. The lessee contended the lease was *not* perpetual, and the parties did not challenge a trial court ruling that the lease did not give the lessee the right to perpetual renewals. (*Id.,* 879 A.2d at p. 740.) Although the *Pope* court repeatedly stated it was not concerned with "perpetual renewals," it employed a standard it described as similar to "that which we use to decide whether a lease agreement creates a perpetual leasehold," and concluded the lease afforded the lessee a right to "continual renewals." (*Id.* at pp. 741, 744, 746.) The *Pope* court found language stating the lease would automatically renew "plainly and unequivocally demonstrates that the parties intended to create a right to continual renewals." (*Id.* at p. 741.) The court also rejected arguments that other lease provisions, such as restrictions on the

---

[8] The *Pechenik* court commented: "The logic of this definition [of 'successive'] eludes our understanding. This Court holds that in the case *sub judice* the word 'successive' means 'one after the other,' and the option provision makes the duration as long as the lessee wishes." (*Pechenik, supra,* 205 S.E.2d at pp. 814–815.)

use of property, or a covenant requiring the lessee to return the property in good condition, suggested the parties did not intend to create a right to continual renewals.[9]

■ Although *Pope* is not entirely dissimilar to the case at bar, we find the cases adopting a narrow approach more persuasive. We reaffirm the principle stated in *Becker* that to be construed as including a right to perpetual or unlimited renewals, the lease language must clearly demonstrate the parties' intention to give the lessee that right. We do not follow the North Carolina Supreme Court's approach of requiring that certain words be present to create the right to perpetual renewals. (*Lattimore, supra*, 329 S.E.2d at pp. 349–350.) However, we agree with that court's assessment that requiring clear and unequivocal language in a provision intended to convey a right to perpetual renewals appropriately protects "property owners from inadvertently leasing away their property forever," and forces "the parties to a lease to specifically consider and directly express their intent." (*Id.* at pp. 348–349.) We will not interpret the option's failure to set an express limit on the number of extensions as an indication that the parties intended the tenant to have the right to extend the lease forever, or as long as the law possibly allows. ■ The option provision before us did not unequivocally demonstrate the parties' intent to create a right to unlimited extensions of the lease. The trial court erred in construing the option as granting Ginsberg that right.

II. *The Option Must Be Construed as Creating a Right to Only One Extension*

This leaves the question of how many times Ginsberg was entitled to extend the lease. In *Becker*, the court stated the general rule: "[L]eases which may have been intended to be renewable in perpetuity, if at all uncertain in that regard, will be construed as importing but one renewal." (*Becker, supra*, 55 Cal.App. at p. 700.) And, as noted above, in *Winslow, supra*, 188 U.S. at page 654, the court explained: "It is quite plain that a lease containing a covenant to renew at its expiration with similar covenants, terms and conditions contained in the original lease is fully carried out by one renewal without the insertion of another covenant to renew." Similarly, in *Penilla*, the

---

[9] Some courts have also found a right to perpetual renewals is clearly created by language that the lease will continue "so long as" the property is used for purposes stated in the lease, and when a positive act by the lessee is required to terminate the lease. (See *President & Trustees v. Athens Livestock Sales* (1961) 115 Ohio App. [18 Ohio Op.2d 78, 179 N.E.2d 382] [lease to continue on a year-to-year basis until terminated by lessees; required a positive act by lessees]; *Davis v. Nokomis Quarry, Inc.* (1979) 77 Ill.App.3d 1011 [33 Ill.Dec. 883, 397 N.E.2d 216, 221]; *Hull v. Quanah Pipeline Corp.* (Tex.Civ.App. 1978) 574 S.W.2d 610, 611 [perpetual renewals where lease to continue " 'so long as' " the premises used for purposes stated in lease].) The lease at issue here does not fit into this category.

court construed a provision allowing " 'the right of renewing this lease' " as conferring only one option to renew. (*Penilla, supra,* 86 Cal.App. at p. 669.)

*Winslow, Penilla,* and similar cases refer to "general" covenants to renew. (See *McLean, supra,* 316 F.Supp. at p. 833; *Gould v. Harley* (1921) 215 Mich. 234 [183 N.W. 705, 706].) However, many courts have applied the "one-renewal-only" rule to more specific renewal or extension provisions. For example, in *Waldrop,* the Alabama Supreme Court construed a provision granting the lessee an option to renew for an additional three-year term and " 'year to year thereafter' " to allow for one 3-year renewal, then one renewal of one additional year. (*Waldrop, supra,* 237 So.2d at pp. 494, 496; see *Lonergan, supra,* 357 A.2d at pp. 914–915; *Chessmasters, supra,* 948 So.2d at pp. 986, 988 [provision for automatic extension of lease for an additional period of five years and detailing rent increase for " 'each extended Five-Year period' " construed to give only one extension].) In a later case, the same court construed a provision allowing the lessee to renew the lease for as long as the property was used for a certain purpose to permit only one renewal. (*Womack v. Hyche* (Ala. 1987) 503 So.2d 832, 833, 836.)

In *Geyer,* the lease gave the lessee the option to renew the lease " 'with and under all the terms and conditions thereof, successively, providing that said lessee shall, at least thirty (30) days before the expiration of any two year period of this lease, or any successive renewals thereof, give written notice of his intention . . . and that upon the 3rd or any subsequent renewal the lessors may, at their option, increase the annual rent . . . .' " (*Geyer, supra,* 103 N.E.2d at p. 201.) The court found the lease did not "so clearly provide for perpetual renewals as to leave no doubt that such was the purpose and intention of the parties." (*Id.* at p. 202.) The court then followed the one-renewal-only rule. The court concluded the lease did not expressly grant a right to a third or subsequent renewal. The court reasoned: "Bearing in mind that the lease should not be construed as a lease in perpetuity if it can be construed otherwise, the provision must be considered only as a recognition of the fact that the lease *might* be renewed three or more times and to provide for an increased rental in that event. Since the covenant for renewal does not authorize renewals in perpetuity, it must be limited to a single renewal in the absence of language clearly authorizing a different number." (*Ibid.*; see *Cook, supra,* 871 N.E.2d at pp. 1008–1009 [accord].)

Similarly, in *Burke,* the New Mexico Supreme Court construed a lease containing a renewal provision that allowed the lessee the right to renew the lease for " 'successive like terms' " as providing only one renewal. (*Burke, supra,* 621 P.2d at pp. 1120–1121; see *Bancard Services, supra,* 292 F.Supp.2d at p. 1251 [construing renewal provision allowing lessee to extend agreement for additional periods of five years each to allow only one renewal period];

*Pults, supra,* 745 S.W.2d at p. 146 [option to renew " 'for successive terms of one year' " construed to allow only one renewal]; *Carder, supra,* 97 P.3d at pp. 180, 182 [option to renew for " 'successive periods of 5 years each' " interpreted to allow only one renewal period].)

We again acknowledge that some courts have taken a different approach. After concluding a lease renewal provision does not provide perpetual renewals, but that the language supports multiple renewal periods, some courts have remanded the case for submission of extrinsic evidence relevant to the parties' intent (*Oak Bay, supra,* 648 P.2d at p. 468); concluded that the lessee had the option to renew the lease for the duration of the lessee's lifetime (*Farone, supra,* 521 N.Y.S.2d at p. 160 [parties had already renewed the lease more than once]); or, based on the language of the lease, determined it provided a certain finite number of renewals (*Schroeder, supra,* 696 So.2d at pp. 498–499 [renewal for "successive five . . . year periods" interpreted as allowing two renewal periods]; *Tucker v. Byler* (1976) 27 Ariz.App. 704 [558 P.2d 732, 735] [covenant that lease could be renewed for a one-year period on the same terms as the original lease, including the renewal option; court construed lease as allowing two renewal periods].)

Ginsberg contends that if we find the lease is ambiguous, we should remand to the trial court for a trial in which the parties may introduce extrinsic evidence to prove their intent as to the number of extensions. However, we conclude the better approach is the one set forth by *Becker,* which comports with the long-standing rule in numerous other jurisdictions. As stated in *Becker,* if whether a lease is to be perpetually renewed is at all uncertain, it "will be construed as importing but one renewal." (*Becker, supra,* 55 Cal.App. at p. 700; see *Cook, supra,* 871 N.E.2d at p. 1009 [although lease was not perpetual, renewal provision awarded "limitless number of renewals"; applying general rule and construing as only one].) We therefore construe the parties' lease as allowing only one 5-year extension of the lease. The extended period ended in 2006.

### *Ginsberg's Cross-appeal*

III. *The Trial Court Properly Struck the Punitive Damages Award*

Ginsberg challenges the trial court's order striking the jury's punitive damage award. She acknowledges that punitive damages are not available for the breach of a contractual obligation. (Civ. Code, § 3294, subd. (a).) Yet, she contends California law recognizes a tort version of the breach of the covenant of quiet enjoyment, which she proved at trial. Although some courts have either explicitly or implicitly recognized a tort in connection with a breach of the covenant of quiet enjoyment, a careful reading of these cases

reveals that they describe a claim that Ginsberg did not plead, prove, or submit to the jury: wrongful eviction. Ginsberg also suggests Gamson's conduct amounted to both a tort and a breach of contract. We disagree.

The question we consider is one of law: Were punitive damages available in connection with Ginsberg's claim for "intentional interference with use of premises"? "[W]hether a certain measure of damages is permissible given the legal right the defendant has breached, is a matter of law, subject to de novo review." (*New West Charter Middle School v. Los Angeles Unified School Dist.* (2010) 187 Cal.App.4th 831, 843 [114 Cal.Rptr.3d 504].)

## A. There Was No Tort Claim at Issue Entitling Ginsberg to Punitive Damages

Tort liability is a necessary predicate for punitive damages. Punitive damages may not be awarded as relief in a breach of contract claim. (Civ. Code, § 3294, subd. (a); *Applied Equipment Corp. v. Litton Saudi Arabia Ltd.* (1994) 7 Cal.4th 503, 516 [28 Cal.Rptr.2d 475, 869 P.2d 454] (*Applied Equipment Corp.*); *Cyrus v. Haveson* (1976) 65 Cal.App.3d 306, 316 [135 Cal.Rptr. 246].) Ginsberg argues she pled and proved a tort claim for "intentional interference with use of premises." She describes this cause of action as a "tort claim for breach of the covenant of quiet enjoyment," or as "intentional interference with use, possession and quiet enjoyment of the Leased Premises." Although Ginsberg titled the claim "intentional interference with use," we can only conclude that the claim was one for breach of the implied covenant of quiet enjoyment. Indeed, Ginsberg's discussion of the claim refers to a breach of the implied covenant, and she relies only upon legal authorities that analyze claims for breach of the implied covenant of quiet enjoyment, as discussed in greater detail below. This was a claim for breach of a contractual obligation, not a tort.

### 1. Breach of the Implied Covenant of Quiet Enjoyment Is a Contract Claim

■ "In the absence of language to the contrary, *every lease* contains an implied covenant of quiet enjoyment, whereby the landlord impliedly covenants that the tenant shall have quiet enjoyment and possession of the premises. [Citations.] The covenant of quiet enjoyment 'insulates the tenant against any act or omission on the part of the landlord, or anyone claiming under him, which interferes with a tenant's right to use and enjoy the premises for the purposes contemplated by the tenancy. [Citations.]' [Citation.]" (*Andrews v. Mobile Aire Estates* (2005) 125 Cal.App.4th 578, 588 [22 Cal.Rptr.3d 832], fn. omitted (*Andrews*).)

■ The implied covenant of quiet enjoyment implies a term in a contract, and a breach of the covenant gives rise to an action in contract. As

such, the damages available for a breach of the covenant are contract damages. In *Andrews*, the court explained that when a landlord deprives a tenant of beneficial enjoyment of the leased property, the tenant may " 'sue for breach of contract damages . . . [citation]' [citation] as well as for injunctive relief. [Citation.] [¶] Civil Code section 3304 prescribes the measure of damages for breach of the covenant of quiet enjoyment. Additionally, case law holds a tenant suing for breach of the covenant of quiet enjoyment may recover contract damages in accordance with Civil Code section 3300—an amount that will compensate the aggrieved party for all the detriment caused by the breach or which in the ordinary course would be a likely result. [Citation.] Thus, in an appropriate case, recovery may include, inter alia, lost profits [citation], lost business goodwill [citation] and moving expenses." (*Andrews, supra*, 125 Cal.App.4th at pp. 590–591, fn. omitted.)

2. *Courts Have Only Allowed Tort Damages in Connection with Wrongful Eviction Claims*

Ginsberg argues California courts have recognized a tort claim for breach of the covenant of quiet enjoyment, and this was the claim she pursued at trial. We disagree. Ginsberg's argument misinterprets the law regarding the breach of the implied covenant of quiet enjoyment.

a. *Breach of the implied covenant of quiet enjoyment and wrongful eviction*

The implied covenant of quiet enjoyment or possession may be breached in multiple ways.[10] The claim has often been inextricably tied to breach of the covenant by eviction, which disturbs the tenant's right to undisturbed possession of the leased premises. If the landlord ousts the tenant, there is an actual eviction. (*Petroleum Collections Inc. v. Swords* (1975) 48 Cal.App.3d 841, 847 [122 Cal.Rptr. 114] (*Petroleum Collections*).) If the landlord's acts or omissions affect the tenant's use of the property and compel the tenant to vacate, there is a constructive eviction. (*Green v. Superior Court* (1974) 10 Cal.3d 616, 625, fn. 10 [111 Cal.Rptr. 704, 517 P.2d 1168] (*Green*); *Groh v. Kover's Bull Pen, Inc.* (1963) 221 Cal.App.2d 611, 614 [34 Cal.Rptr. 637].) In either case, the tenant must vacate. (*Lori, Ltd. v. Wolfe* (1948) 85 Cal.App.2d 54, 65 [192 P.2d 112] ["In order that there be a constructive eviction it is essential that the tenant should vacate the property. There is no constructive eviction if the tenant continues in possession of the

---

[10] Many cases have referred to breach of the implied covenant of quiet enjoyment, or the implied covenant of quiet or peaceable possession, interchangeably. (See, e.g., *Standard Livestock Co. v. Pentz* (1928) 204 Cal. 618, 620–621, 625 [269 P. 645] (*Standard Livestock*); 12 Witkin, Summary of Cal. Law, *supra*, § 610, p. 709 ["In every lease, there is an implied covenant by the lessor of quiet enjoyment and possession during the term."].)

premises however much he may be disturbed in the beneficial enjoyment."].) Many courts have accordingly repeated the general premise that "the covenant of quiet enjoyment is not broken until there has been an actual or constructive eviction . . . ." (*Petroleum Collections, supra,* at p. 847; see *Standard Livestock, supra,* 204 Cal. at p. 625; *Clark v. Spiegel* (1971) 22 Cal.App.3d 74, 79–80 [99 Cal.Rptr. 86].)

However, in *Guntert v. City of Stockton* (1976) 55 Cal.App.3d 131 [126 Cal.Rptr. 690] (*Guntert*), the court distinguished claims in which the landlord has actually or constructively ousted the tenant from those in which the landlord's interference with the tenant's enjoyment or use of the property does not lead to ouster. The *Guntert* court recognized that a tenant has alternative remedies to respond to the landlord's interference and, instead of vacating, may "stand upon the lease and sue for damages." (*Id.* at p. 140.) In *Guntert*, the plaintiff tenant had not quit the premises, despite the landlord's service of an invalid and bad faith eviction notice. The court thus concluded: "[The tenant] is not suing for a wrongful, constructive eviction but for the lessor's unjustified and unauthorized interference with his profitable use of the leased property. The rule requiring ouster or surrender prior to suit for wrongful eviction does not preclude the tenant from his election to stand upon the lease, remain in possession and sue *for breach of contract damages*." (*Id.* at p. 141, italics added.)

Subsequent cases have similarly drawn a distinction between a wrongful eviction claim, and one in which the tenant remains in possession of the premises and sues for damages arising out of the landlord's interference with the tenant's beneficial use of the leased premises. For example, in *Cunningham v. Universal Underwriters* (2002) 98 Cal.App.4th 1141, 1153 [120 Cal.Rptr.2d 162], the court explained: "While a claim for breach of the covenant of quiet enjoyment is similar to a constructive eviction claim, the critical difference is that the latter claim may not be brought until the tenant has vacated the property." Thus, breach of the implied covenant of quiet enjoyment can be understood as a title encompassing claims for wrongful eviction, and also claims in which the tenant's use of the premises is disturbed, but the tenant remains in possession.

> b. *Courts have only attached tort liability to wrongful eviction claims*

It is true, as Ginsberg asserts, that some courts have implicitly or explicitly indicated a tenant may recover punitive damages in connection with a claim for breach of the implied covenant of quiet enjoyment, or identified the claim as a tort. However, all of those cases describe wrongful eviction claims. In other words, they are cases in which the implied covenant of quiet enjoyment

is breached by a wrongful eviction. For example, Ginsberg relies on *Barkett v. Brucato* (1953) 122 Cal.App.2d 264 [264 P.2d 978] (*Barkett*). In *Barkett*, the landlord engaged in a series of egregious acts intended to force the residential tenants to vacate the premises, such as authorizing the removal of the building's roof during the rainy season, leading to extensive flooding in the tenants' apartment. (*Id.* at pp. 271–272.) The tenants eventually vacated the flat. (*Id.* at p. 272.) They then filed suit, alleging claims for breach of the covenant of quiet enjoyment, negligence, and "conspiracy to willfully and maliciously harass" the tenants. (*Id.* at p. 266.) A jury returned a general verdict against the landlord, and awarded $5,000 in damages, but did not award any punitive damages. (*Ibid.*)

On appeal, the landlord argued she could not be held liable on the conspiracy count because the jury exonerated the other defendants, and she could not have conspired with herself alone. (*Barkett, supra*, 122 Cal.App.2d at pp. 273–274.) The Court of Appeal rejected this argument. It reasoned:

"[T]he allegations of conspiracy are mere surplusage in a case where the conspiracy itself is unproved but there is evidence of actionable conduct on the part of one defendant. . . .

*"Here the basic tort alleged in the third cause of action was the willful wrongful eviction*, that is, the breach of the covenant of quiet enjoyment, accomplished by a series of intentionally annoying acts designed to compel the tenant to vacate. Such a tort (*as distinguished from an action for breach of the covenant of quiet enjoyment*) is recognized in the law. Section 822 of the Restatement of Torts defines this tort as follows:

" 'The actor is liable in an action for damages for a nontrespassory invasion of another's interest in the private use and enjoyment of land if,

" '(a) the other has property rights and privileges in respect to the use or enjoyment interfered with; and

" '(b) the invasion is substantial; and

" '(c) the actor's conduct is a legal cause of the invasion; and

" '(d) the invasion is either

" '(*i*) intentional and unreasonable; or

" '(*ii*) unintentional and otherwise actionable under the rules governing liability for negligent, reckless or ultra-hazardous conduct.'

"California recognizes the existence of such a tort. (*Tooke* v. *Allen* [(1948)] 85 Cal.App.2d 230 [192 P.2d 804]; *Sanders* v. *Allen* [(1948)] 83 Cal.App.2d 362 [188 P.2d 760]; *Butler* v. *Allen* [(1946)] 73 Cal.App.2d 866 [167 P.2d 488].) . . . The jury could have held appellant for an independent tort upon the third cause of action by reason of her intentional and even malicious conduct already described. When this conduct is considered, together with the attempt to secure permission to evict respondents, it is a reasonable inference that the construction was undertaken for the purpose of eviction so that appellant could once more obtain the illegal profits of rent overcharging." (*Barkett, supra,* 122 Cal.App.2d at pp. 274–275, italics added.)

The *Barkett* court explicitly described a cause of action for wrongful eviction, which it distinguished from an action for breach of the covenant of quiet enjoyment. Irrespective of the court's use of elements relating to private nuisance to explain the claim, it remains clear that the *Barkett* court was describing wrongful constructive eviction. An essential element of a wrongful eviction claim is that the tenant has vacated the premises. (*Green, supra,* 10 Cal.3d at p. 625, fn. 10; *Petroleum Collections, supra,* 48 Cal.App.3d at p. 847.) Ginsberg incorrectly interprets *Barkett* as authorizing tort liability for a breach of the covenant of quiet enjoyment, instead of describing a tort claim for wrongful eviction.

The California authorities the *Barkett* court cited, and upon which Ginsberg relies, also concerned wrongful evictions. In *Sanders, supra,* 83 Cal.App.2d 362, the court described the plaintiff's cause of action as "one for damages for constructive eviction. There is alleged a series of acts which were designed to and allegedly did operate to deprive the tenants of the beneficial enjoyment of the premises, causing them to abandon them. [¶] . . . [¶] . . . In other words, damages are sought for *loss of the premises* resulting from a breach of duty on the part of the defendants by a series of acts done with the intent to deprive the tenants of the quiet enjoyment of the premises." (*Id.* at p. 367, italics added.) The plaintiff sought exemplary damages in the complaint. The Court of Appeal concluded the plaintiff had stated a cause of action sufficient to withstand demurrer.

Likewise, in *Butler, supra,* 73 Cal.App.2d 866, the landlord locked the tenant out of her apartment. A jury awarded the tenant actual and punitive damages. (*Id.* at p. 869.) On appeal, the defendant contended the verdict was not supported by the evidence, and that the verdict was excessive. The court rejected this argument, citing evidence of the landlord's "unwarranted and malevolent procedure" in conducting an "unlawful eviction" of the tenant. (*Ibid.*) The court concluded that compensatory and punitive damages in such a case were left to the sound discretion of the jury and the trial judge, and the

court found no abuse of that discretion.[11] (*Butler*, at pp. 869–870.) In *Tooke v. Allen, supra*, 85 Cal.App.2d 230, 232–233 (*Tooke*), the tenant had vacated the premises due to the landlord's " 'campaign of annoyance.' " The court noted the tenant had a right to recover damages for "interference with her right of peaceful possession." (*Tooke*, at p. 236.) Of exemplary damages, the court said only that they were "amply supported by the evidence." (*Id.* at p. 239.)

To the extent these cases acknowledged a tort claim, it was for wrongful constructive or actual eviction. (See *Glaser v. Meyers* (1982) 137 Cal.App.3d 770, 774 [187 Cal.Rptr. 242] [citing *Barkett* in support of statement that "[t]ort actions to recover damages for willful wrongful evictions have long been recognized in California . . ."]; see also *Munoz v. MacMillan* (2011) 195 Cal.App.4th 648, 654–655 [124 Cal.Rptr.3d 664] [noting tort action for wrongful eviction].) These cases do not support the proposition that a tort claim arises out of the breach of the covenant of quiet enjoyment, when there has been no eviction and the tenant remains in possession of the premises.

Ginsberg's reliance on *Spinks v. Equity Residential Briarwood Apartments* (2009) 171 Cal.App.4th 1004 [90 Cal.Rptr.3d 453], is also misplaced. In *Spinks*, the court explicitly distinguished between a claim for breach of the implied covenant of quiet enjoyment, which it identified as a contract claim, and a claim for wrongful eviction, which it identified as a tort. (*Id.* at pp. 1030–1031, 1036.) The court further stated: "In contrast to plaintiff's contract-based claim [for breach of the implied covenant of good faith and fair dealing], punitive damages may be available for the torts of wrongful eviction, trespass, invasion of privacy, and intentional infliction of emotional distress." (*Id.* at p. 1055.) In this context, when the court stated in the next paragraph, "As long-standing authority makes clear, punitive damages may be awarded in an action by a residential tenant based on the landlord's interference with peaceful possession, we understand the court to mean interference with peaceful possession in the form of wrongful eviction.[12] (*Spinks*, at p. 1055, citing *Tooke, supra*, 85 Cal.App.2d at pp. 236, 239.)

---

[11] Neither the *Sanders* court nor the *Butler* court discussed whether the cause of action at issue was properly characterized as a tort, or whether tort damages were permissible as a matter of law. In *Butler*, the court only considered whether the damages awarded were excessive. We also note that *Sanders*, *Butler*, and *Tooke* all shared the same defendant-landlord. (See *Tooke, supra*, 85 Cal.App.2d at p. 239.)

[12] *Favour v. Geltis* (1949) 91 Cal.App.2d 603 [205 P.2d 424], also fails to support Ginsberg's argument. The case involved a landlord's malicious actions, but the court did not specifically identify the claims asserted in the plaintiffs' complaint, other than to indicate that it "joined in one count allegations of damage to person and property," and apparently there was evidence that the landlord's actions caused the plaintiffs "nervousness and mental and physical suffering," sufficient to support an award of actual and punitive damages. (*Id.* at p. 605.) The case does not provide enough information about the actual claims asserted to stand for the

As explained in *Guntert,* when the landlord has breached the implied covenant of quiet enjoyment, but the tenant remains in possession of the premises, the tenant's remedy is to "sue for breach of contract damages." (*Guntert, supra,* 55 Cal.App.3d at p. 141.) Ginsberg did not plead a wrongful eviction claim, or submit such a claim to the jury.[13] (*Mammoth Lakes Land Acquisition, LLC v. Town of Mammoth Lakes* (2010) 191 Cal.App.4th 435, 468 [120 Cal.Rptr.3d 797].) Moreover, the evidence at trial was that she remained in possession of the premises. Even if Ginsberg could have asserted a wrongful eviction claim, this was not the theory she prosecuted or submitted to the jury. She also asserted no other tort claim. Ginsberg cannot raise new theories of liability for the first time on appeal. (*Beroiz v. Wahl* (2000) 84 Cal.App.4th 485, 498, fn. 9 [100 Cal.Rptr.2d 905]; *United States Golf Assn. v. Arroyo Software Corp.* (1999) 69 Cal.App.4th 607, 623 [81 Cal.Rptr.2d 708].) There was no tort liability established that would entitle her to punitive damages.[14]

---

proposition that a breach of the implied covenant of quiet enjoyment which does not result in an eviction will support a punitive damage award. *Beckett v. City of Paris Dry Goods Co.* (1939) 14 Cal.2d 633 [96 P.2d 122], concerned an action for unlawful eviction. (*Beckett,* at p. 635.) The out-of-state authorities Ginsberg cites are equally unhelpful. In *Daniels v. Dean* (1992) 253 Mont. 465 [833 P.2d 1078, 1080, 1083–1084], the court explicitly affirmed a punitive damages award for the torts of defamation and tortious interference with the tenant's business relationships with customers. Here, the only "tort" theory Ginsberg pursued was for "intentional interference with use of premises." In *I. H. P. Corp. v. 210 Central Park South Corp.* (N.Y.App.Div. 1962) 16 A.D.2d 461 [228 N.Y.S.2d 883, 885], a tenant "sued to restrain . . . defendants from interfering with its occupation and to recover damages sustained when defendants, on two occasions, attempted to bar plaintiff from the leased premises." The court's concern was whether punitive damages are forbidden in actions seeking equitable relief. The case is not persuasive authority for the proposition that, in California, punitive damages are available for a breach of the implied covenant of quiet enjoyment, as opposed to a wrongful eviction claim.

[13] The jury instruction the court gave on the "intentional interference with use" claim read: "Implied in every rental agreement is a covenant of [quiet] enjoyment by which the landlord impliedly promises to allow the tenant possession and 'quiet enjoyment' of the premises during the lease term and not to, through act or omission, disturb the tenant's possession and beneficial enjoyment of the premises for the purposes contemplated in the lease. [¶] In order to prevail on her claim for Intentional Interference with Use of Property, plaintiff must prove that acts or omissions of defendant substantially interfered with plaintiff's right to use and enjoy the leased premises. Acts or omissions amounting only to inconvenience and annoyance are not sufficient to meet this standard of proof." This instruction described a claim for breach of the covenant of quiet enjoyment based on a violation of the implied contractual obligation. (See *Andrews, supra,* 125 Cal.App.4th at pp. 588–589.)

[14] Our analysis does not depend on the distinction between commercial and residential leases. We do not consider whether a commercial tenant may bring a tort claim for wrongful eviction.

### B. *Tort Damages Are Not Available for the Breach of Contract at Issue in This Case*

Ginsberg also summarily argues that although Gamson's conduct constituted a breach of contractual obligations, Gamson also breached an independent duty arising from tort law principles, thus tort damages were proper. We again disagree.

" '[C]ourts will generally enforce the breach of a contractual promise through contract law, except when the actions that constitute the breach violate a social policy that merits the imposition of tort remedies.' [Citation.]" (*Erlich v. Menezes* (1999) 21 Cal.4th 543, 552 [87 Cal.Rptr.2d 886, 981 P.2d 978].) In *Applied Equipment Corp., supra,* 7 Cal.4th 503, the California Supreme Court explained the principles that are controlling here:

"Conduct amounting to a breach of contract becomes tortious only when it also violates an independent duty arising from principles of tort law. 'The law imposes the obligation that "every person is bound without contract to abstain from injuring the person or property of another, or infringing upon any of his rights." ([Civ. Code, former § 1708].) This duty is independent of the contract . . . . "[A]n omission to perform a contract obligation is never a tort, unless that omission is also an omission of a legal duty." ' [Citation.] [¶] . . . [¶]

". . . [P]*unitive or exemplary damages, which are designed to punish and deter statutorily defined types of wrongful conduct, are available only in actions 'for breach of an obligation not arising from contract.*' (Civ. Code, § 3294, subd. (a), italics added.) In the absence of an independent tort, punitive damages may not be awarded for breach of contract 'even where the defendant's conduct in breaching the contract was willful, fraudulent, or malicious.' [Citations.]

"Within the different spheres of contract and tort, motivations for conduct are also treated differently. In an intentional tort action, motives amounting to malice, oppression, or fraud may justify punitive damages. (Civ. Code, § 3294.) But the law generally does not distinguish between good and bad motives for breaching a contract. '[I]n traditional contract law, the *motive* of the breaching party generally has no bearing on the scope of damages that the injured party may recover for the breach of the implied covenant [of good faith and fair dealing]; the remedies are limited to contract damages.' [Citation.] 'Varying personal or economic reasons motivate one to breach his contract, but the general rule is that . . . motives . . . are immaterial and cannot be inquired into on the question of compensatory damages.' [Citation.]" (*Applied Equipment Corp., supra,* 7 Cal.4th at pp. 515–516, some

italics added; see *Stop Loss Ins. Brokers, Inc. v. Brown & Toland Medical Group* (2006) 143 Cal.App.4th 1036, 1041 [49 Cal.Rptr.3d 609]; *Harris v. Atlantic Richfield Co.* (1993) 14 Cal.App.4th 70, 82 [17 Cal.Rptr.2d 649].)

Gamson's conduct at issue here consisted of her failures to perform under the lease's express and implied covenants. Ginsberg has not identified any duty Gamson had, and breached, that was independent of the contract. Ginsberg did not plead an independent tort and did not submit any tort claims to the jury. Instead, Ginsberg essentially argues that Gamson maliciously breached the contract, and asserts that Gamson's evil motive for breaching her contractual duties warranted imposition of tort remedies. It did not. (*Ilkhchooyi v. Best* (1995) 37 Cal.App.4th 395, 412 [45 Cal.Rptr.2d 766].) The trial court properly struck the punitive damages award.

## IV. *Appellate Remedy*

We address three issues concerning the relief awarded at trial and the appropriate proceedings on remand from this court.

### A. *No Retrial of Ginsberg's Claims*

No party has challenged the jury's liability determination or award of compensatory damages. Although Gamson summarily argues a reversal of the trial court's ruling on her declaratory relief claims requires a new trial of Ginsberg's breach of lease claims, she does not support this argument with any citations to legal authority; she further expressly states an intent to forfeit any right to a retrial on Ginsberg's claims. (*Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 956 [124 Cal.Rptr.3d 78].) In general, a reviewing court may order a limited retrial of only some issues if they are distinct from other issues and a partial retrial will not prejudice either party. (*Collins v. Plant Insulation Co.* (2010) 185 Cal.App.4th 260, 276 [110 Cal.Rptr.3d 241].)

While Gamson notes that Ginsberg was allowed to present to the jury her theory that Gamson improperly sought to renegotiate or terminate the lease, Gamson does not challenge the compensatory damage award on appeal. And although Ginsberg "requests" a new trial, she is not entitled to a retrial as a result of our decision affirming the trial court's order striking the jury's punitive damage award. Ginsberg also had a full and fair opportunity to litigate her claims. She was able to present evidence premised on her theory that she was entitled to unlimited renewals of the lease, and she secured a verdict in her favor on her claims. (See *Regalia v. The Nethercutt Collection* (2009) 172 Cal.App.4th 361, 370 [90 Cal.Rptr.3d 882].)

The reviewing court will avoid ordering a retrial of all issues when some can "be determined separately without prejudice to any party . . . to

relieve the trial court and the parties of the unnecessary burden of relitigating issues that have been decided, and to respect and preserve the results of a trial on issues as to which the appellant has not shown error." (*Bullock v. Philip Morris USA, Inc.* (2008) 159 Cal.App.4th 655, 696 [71 Cal.Rptr.3d 775].) Under the circumstances of this case, we do not remand for a retrial. Instead, the jury's verdict as to liability and compensatory damages will stand, and we direct the trial court to enter a revised judgment as to Gamson's declaratory relief claims in accordance with our decision in this opinion.

### B. *Injunctive Relief*

 The court's order issuing an injunction was premised in part on the ruling that the parties' lease afforded Ginsberg unlimited renewals until 2095. The parties would therefore be in an ongoing contractual relationship. In light of our interpretation of the lease, above, this premise is no longer valid. Per the terms of the lease, Ginsberg became a month-to-month holdover tenant after the expiration of the one extended period. We cannot assume the parties' relationship will continue. (*Mallon v. City of Long Beach* (1958) 164 Cal.App.2d 178, 190 [330 P.2d 423] [injunctive power is not punishment for past acts and is ordered only if there is evidence past acts will probably recur].) We direct the trial court to exercise its discretion and reassess whether injunctive relief is an appropriate remedy.[15] (Civ. Code, § 3422; *New Tech Developments v. Bank of Nova Scotia* (1987) 191 Cal.App.3d 1065, 1072 [236 Cal.Rptr. 746] [superior court should modify or vacate injunction on party's motion if it finds change in facts, law, or justice would be served by modification or revocation].)

### C. *Attorney Fees*

Although we only partially reverse the judgment, we conclude the partial reversal also compels the reversal of the award of fees as costs to the prevailing party based on the judgment. The trial court must reassess the prevailing party determination, and the applicability of Gamson's offer made pursuant to Code of Civil Procedure section 998. (*Gillan v. City of San Marino* (2007) 147 Cal.App.4th 1033, 1053 [55 Cal.Rptr.3d 158].) As we understand the trial court's statements at the hearing on attorney fees and Gamson's motion to strike or tax costs, the court concluded the section 998 offer was inapplicable because Ginsberg prevailed on nonmonetary issues identified in the offer in addition to the compensatory damage award. In light of our decision reversing the trial court's ruling on the proper interpretation of the lease, on remand the trial court must reassess the applicability of the section

---

[15] We note that at oral argument in this case, Ginsberg's counsel appeared to concede that if this court reversed the trial court's ruling on the interpretation of the lease, an injunction would no longer be appropriate.

998 offer in this case; at that time the parties may present any additional arguments regarding the validity of the offer. (*Sharabianlou v. Karp* (2010) 181 Cal.App.4th 1133, 1151 [105 Cal.Rptr.3d 300].)

## DISPOSITION

The portion of the judgment adjudicating Gamson's claims for declaratory relief is reversed. The court is directed to enter a new judgment on the declaratory relief claims in accordance with this opinion. The trial court's order striking the punitive damage award is affirmed. Gamson shall recover her costs on appeal.

Flier, J., and Grimes, J., concurred.

A petition for a rehearing was denied May 24, 2012, and the petition of appellant Esther Ginsberg and appellant Harry Eden for review by the Supreme Court was denied August 8, 2012, S203196.